[Civ. No. 29980. First Dist., Div. One. Dec. 31, 1971.]

815 MISSION CORPORATION, Petitioner, v.
THE SUPERIOR COURT OF THE CITY AND COUNTY OF
SAN FRANCISCO, Respondent;
SAN FRANCISCO REDEVELOPMENT AGENCY,
Real Party in Interest.

## COUNSEL

Crimmins, Kent, Bradley & Burns, Robert E. Burns, Barrett, Ferenz, Bramhall & Klemm, J. Bradley Klemm, Silber & Kipperman and Steven M. Kipperman for Petitioner.

Amanda H. Fisher and Sidney M. Wolinsky as Amici Curiae on behalf of Petitioner.

· No appearance for Respondent.

Rogers, Vizzard & Tallett, John D. Rogers and Henry F. Davis for Real Party in Interest.

## OPINION

**SIMS, Acting P. J.**—An alternative writ of mandate and an alternative writ of prohibition were issued in these proceedings to review the action of the trial court in refusing to consider the sufficiency of a demand for possession made under the Federal Housing and Redevelopment Act of 1965, and the validity of the trial court's order for possession based on that demand. It is determined that the trial court erroneously failed to consider the petitioner's objections, but that since the objections are not legally sufficient, the alternative writs should be discharged, and the petition for peremptory writs should be denied.

On December 17, 1970 this court filed its decision (13 Cal.App.3d 561 [91 Cal.Rptr. 886]) granting in part and denying in part the petition of Redevelopment Agency of the City and County of San Francisco (real party in interest in these proceedings) for a writ of mandate directed to the trial court in proceedings in which the redevelopment agency sought possession of the previously condemned property of 815 Mission Corporation (real party in interest in those proceedings, and petitioner herein). Reference is made to that decision for the facts with respect to the background of this litigation. So far as is material to these proceedings it was then concluded that under the federal statute (42 U.S.C.A. § 3072, subd. (3))[1] and regulations adopted pursuant to it (Urban Renewal Handbook

---

[1]The specific provision reads as follows:

". . . (3) the construction or development of any public improvements shall be so scheduled that no person lawfully occupying the real property shall be required to surrender possession on account of such construction or development without at least 90 days' written notice from the applicant of the date on which such construction or development is scheduled to begin." It was enacted as section 402 of title IV of the Housing and Urban Development Act of 1965 (Pub.L. 89-117, 79 Stat. 485). In 1971, said section was repealed by section 306 of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (Pub.L. 91-646, 84 Stat. 1894) section 301(5) of which provides, in part, as follows:

". . . (5) The construction or development of a public improvement shall be so

of the Department of Housing and Urban Development, ch. 4, § 2, RHA 7208.1), there was no right of immediate possession on condemnation but possession could only be had by the giving of the 90-day notice prescribed. (13 Cal.App.3d at p. 568.) On or about January 6, 1971, the redevelopment agency gave the corporation a notice demanding possession of the premises then occupied by it on or before April 15, 1971.[2] This notice referred to the statute and regulations noted in the opinion of this court. The corporation attacked the sufficiency of the notice by motion. The trial court refused to consider the objections to the notice and granted an order for possession. These proceedings ensued.

The corporation filed its petition for writ of mandamus and/or prohibition with this court on June 21, 1971, and it was assigned to Division Two. Petitioner seeks review of the proceedings which resulted in an order of possession signed and filed June 1, 1971. The order recites, "This Order is based upon findings that under the decision of the Court of Appeal, this Court's jurisdiction and powers with respect to the 90-day written notices served upon Louis J. Silver and 815 Mission Corporation are limited to the question of whether or not said notices comply on their face with the Federal regulations and were duly served, and that this Court had no jurisdiction to determine other questions of law with respect to the validity of said notices; . . ." Petitioner asserts that the court erroneously refused to exercise jurisdiction to consider its contentions (1) that the "90-day notice" was prematurely given in that no plans for construction or development of public improvements existed as asserted on the face of the notice, and (2) that petitioner had not been

scheduled that, to the greatest extent practicable, no person lawfully occupying real property shall be required to move from a dwelling (assuming a replacement dwelling as required by title II will be available), or to move his business of farm operation without at least ninety days' written notice from the head of the Federal agency concerned, of the date by which such move is required."

[2]According to the declaration of petitioner's secretary and managing officer, petitioner corporation not only operates the business of the Milner Hotel on the premises in question, but also operates a bar and an import and export business under the fictitious name of Silver & Co., manufacturing small kitchen devices and related articles on the premises. Although complaint was made that no notice was given to Silver & Co., the trial court found "that 90-day notices for possession of property described in the Final Order of Condemnation having been furnished to commercial tenants thereof on January 6, 1971, including 815 Mission Corporation; Louis J. Silver, who as an individual is doing business on said premises both as Silver and Company and Mister Pots; Metropolitan Parking Corporation; Parsons, Brinkerhoff, Tudor & Bechtel; Castle Cafe; and an organization doing business on the premises under the name of Toor (Tenants and Owners in Opposition to Redevelopment), . . ." The order of possession runs against all of those commercial tenants. Metropolitan Parking Corporation, Parsons, Brinkerhoff, Tudor & Bechtel, and Castle Cafe did not object to the entry of the order of possession. Toor, which intervened to oppose the order, did not join in the petition for the writs.

afforded the "relocation assistance to which it was and is entitled under applicable Federal law."

The petitioner prayed for alternative writs and peremptory writs which would direct the trial court to vacate its order for possession and determine the legal questions of the validity of the 90-day notice upon which the order was predicated, and which would prohibit the trial court from taking any further steps or proceedings to enforce that order until it determines those legal questions.

On August 3, 1971, after consideration of the petition, points and authorities filed in opposition to the petition, and other communications from the parties, the petition was denied by Division Two. Thereafter, in response to the petitioner's petition for hearing, the Supreme Court granted a hearing and summarily retransferred the case to this division with directions to issue alternative writs of mandate and prohibition as prayed, and to conduct a hearing on the petition. Following the issuance of those writs, the filing of a return by real party in interest and a traverse by the petitioner, the matter was regularly heard. At the hearing it was agreed that if this court found that the trial court had erroneously failed to exercise jurisdiction to consider the objections interposed by petitioner, this court should consider the legal sufficiency of those objections before remanding the case for further hearing.

## I

At the hearing on the petitioner's objections to the sufficiency of the notice the trial judge voiced the views, subsequently incorporated in the order and quoted above, as follows: "So the first matter that obviously has to be determined is the extent and scope of the issues now properly before this Court in light of that decision [*Redevelopment Agency* v. *Superior Court* (1970) 13 Cal.App.3d 561 (91 Cal.Rptr. 886)]. When this matter was originally before the trial court the Court purposely provided in its order that no writ of possession, or writ of assistance should be issued until the giving of a 90-day notice in compliance with Federal Law, and also included the language 'or until the further order of this Court.' The latter clause was purposely included by myself in order to reserve jurisdiction to make any other further orders and final disposition in the case that I might deem reasonable, proper, or necessary. However, the Appellate Court in its decision appears to have by eliminating this clause to circumscribe the Court's powers to make any orders other than those which it wasn't expressly required to make in the Appellate Court's decision. And I quote from the decision in the mandamus proceeding of the Appellate Court as follows: 'the trial court acted properly when it

provided in the order for entry of the final order of condemnation "That no writ of possession or order for possession with respect to the occupants of said property . . . shall be issued as to any such occupant until plaintiff has furnished to such particular occupant the 90-day written notice of the date possession will be required, . . ." ' [13 Cal.App.3d at p. 568] but to continue the quote: 'We perceive, however, that there is no authority for the additional condition imposed that such possession could not be had "until further order of this court." As we view the right of possession, the only limitation which could properly be imposed on petitioner's right to immediate possession was the giving of the subject 90-day notice.' [Id.]

"And they cite the Thorpe case, Thorpe versus Housing Authority, and to continue the quotation from the opinion: 'We are of the opinion, moreover, that the subject statute and regulation in no way purport to limit or restrict the title and estate in the condemned property which vests in the condemner, nor does it purport to grant or create any estate or tenancy in such property in favor of any tenant or occupant save and except the right to remain in possession of the premises lawfully occupied by such tenant or occupant until a notice of at least 90 days is given to such tenant or occupant to surrender possession of said premises.' [Id.]

"Now, this court is of the opinion that when this language is read in the context of the rest of the opinion that unfortunate as it may be in this Court's opinion it does restrict and limit the powers of this Court that by the orders and terms of the writ of mandate that as I read the Appellate Court decision upon the giving of 90-day notices that comply in form with the statutory regulations that this Court has no further power, or jurisdiction but to issue such writs of assistance, or writs of possession as may be proper in the circumstances, and to proceed to determine the reasonable rental value of the portion of the premises still occupied by the defendant, and in view of what I construe to be the limitation of this Court's powers apparently I do not have the jurisdiction to consider the other very serious and important questions that have been raised since this matter has been returned to this court that should be determined, and I have no doubt will be determined in a proper tribunal."

Examination of the language quoted by the trial judge and of the opinion itself reflects that the statement reading ". . . the only limitation which could properly be imposed on petitioner's right to immediate possession was the giving of the *subject* 90-day notice" (italics added)—refers to limitations which the court might impose *sua sponte* under the power it reserved by the phrase "until further order of this court" in the order it made April 13, 1970. The "*subject* 90-day notice" was the 90-day notice prescribed by federal law and regulations, and the trial court had the obligation to

determine whether the notice was sufficient under that law and those regulations. Article VI of the United States Constitution provides in pertinent part: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

There is nothing in *Thorpe* v. *Housing Authority of the City of Durham* (1969) 393 U.S. 268 [21 L.Ed.2d 474, 89 S.Ct. 518], which was relied on by this court in its prior opinion, to the contrary. In fact in *Thorpe* the court expressly recognized that a housing authority was expressly bound by the provisions of federal law and regulations governing evictions. (See 393 U.S. at pp. 278-281 [21 L.Ed.2d at pp. 482-483].)

■ It is concluded that the trial court erroneously misinterpreted the prior decision, and erred in failing to consider the merit of petitioner's objections. The question remains whether either of those objections are legally tenable.

## II

Petitioner's contention that the 90-day notice was prematurely given is predicated upon the statutory provisions which have been set forth in the margin. (See fn. 1 above.) The statute, as it read before the 1971 amendment, states in pertinent part, "[N]o person . . . shall be required to surrender possession on account of such construction or development *without at least 90 days' written notice* from the applicant of *the date on which such construction or development is scheduled to begin.*" (Italics added.)[3] The notice given by the redevelopment agency recited, "This letter constitutes written notice from the San Francisco Redevelopment Agency that construction or development of the public improvements planned for [the premises of petitioner] is scheduled to commence April 19, 1971. Accordingly, demand is hereby made that you surrender possession of such premises no later than April 15, 1971."

Petitioner, in reliance on the words of the statute last emphasized, on April 12, 1971 filed its notice of motion to set aside the notice to vacate. It alleged that the notice was void "on the ground that said notice is in violation of Federal law and regulations, particularly [repealed] section 3072, Title 42, United States Code, in that construction and development

---

[3]Although these provisions were repealed January 2, 1971 by the new legislation referred to in footnote 1, the 90-day notice referred to the prior statute and the regulations which were reviewed in the prior decision of this court. Petitioner contends that the saving clause of the 1971 legislation preserves its rights under the prior law and regulations. In view of the construction given the prior and present law in this opinion, it is unnecessary to resolve that issue.

will not commence in April 1971 or for an indefinite time thereafter." In support of its motion petitioner filed declarations from which it appears that removal of the residential tenants of the Milner Hotel, which has been operated by petitioner, is subject to order of the United States District Court for the Northern District of California, signed November 9, 1970, in proceedings No. C-69 324 SAW, entitled "Tenants and Owners in Opposition to Redevelopment ("TOOR") etc. et al., plaintiffs v. United States Department of Housing and Urban Development ("HUD") et al., defendants." That order provided for arbitration of any displaced persons' or family's complaint about a proposed relocation. By order of clarification signed and filed April 6, 1971 it was made clear that the agency could not bring an action in unlawful detainer against any "residential tenant" until after a hearing before the board of arbitration for which provision had been made in the earlier order. It is also stated that the redevelopment agency proposes to operate the hotel on securing possession; that a proposed rental agreement for the operation of the hotel was tendered the petitioner by the agency on March 9, 1971; that the demand for possession itself referred to the agency's desire to rent the furniture and furnishings in the hotel beyond the date on which possession was demanded; that on March 15, 1971 the agency's representative discussed with petitioner's manager the possibility of entering into a management contract for the operation of the hotel. Petitioner points out that these facts demonstrate that no construction or development could begin until the residents were relocated, and that none was contemplated in the immediate future.

Petitioner further presented newspaper clippings which indicated that the project could not start work until January 1973; and that no plans and specifications had been approved or building permits issued.

On the other hand, in opposition to petitioner's motion the area director for the project involving petitioner's former premises, which it still occupies and operates, stated that the property consists of a surfaced parking lot, a two-story commercial building, and a six-story hotel with ground floor commercial uses; that with the approval of HUD the final selection and designation of a redeveloper was approved on March 16, 1971; that the agency's need for the commercial portion of the real property involved is both immediate and imminent.[4]

---

[4]In support of this conclusion, the director's affidavit continues:
". . . 6. The immediate need for possession of the property is to take necessary actions to insure that the properties will be available for construction of the improvements contemplated and approved at the time such construction can and should commence. Such actions include the commencement of a relocation assistance program for residents (such efforts having already commenced with respect to business site occupants), vacation of the properties, disconnection of utilities, performance of necessary pest control to ready the properties for demolition, the demolition of

Petitioner contends that the foregoing declarations raise issues of fact which must be resolved by the trial court. This contention is dependent on a reading of the law, as it existed either before or after January 2, 1971, and the applicable regulations,[5] as though they provided "no person shall be required to surrender possession on account of such construction or development until 90 days before the date on which such construction or development is scheduled to begin." It is obvious that such an interpretation twists the ordinary meaning of the English language. The statutory provisions impose a restraint on construction and development for 90 days. They do not on their face purport to otherwise extend the right of occupancy. The notice given satisfied the requirements of subsection (3) of former section 402 as added by the 1965 act (42 U.S.C.A. § 3072, subd. (3)), or of subsection (5) of section 301 of the 1971 act (42 U.S.C.A. § 4651, subd. (5).) The question of whether or not there is a policy for deferring displacement of business concerns which cannot be readily located until construction and development are imminent, is related to the policy of furnishing relocation assistance and is discussed below. It may furnish cause why eviction or displacement should not proceed, but it does not demonstrate that the notice did not comply with the literal terms of sections 3702, subdivision (3) and 4651, subdivision (5), as found in title 42 of the United States Code.

## III

Petitioner's motion to set aside the notice—demand for possession—received from the agency, did not directly attack the notice on the ground

---

vacated buildings, the scheduling of official actions to vacate Tehama Street (adjoining the properties formerly owned by the 815 Mission Street Corporation) and the rerouting of, or abandonment of, utilities located within such street area. Since such actions will unquestionably require not less than six months, the Agency's need for possession of the subject real property is immediate in relation to the imminent need to deliver said property to the redeveloper.

"7. The imminent need for possession of subject real property is one in which the date of site delivery and start of construction by the redeveloper is now scheduled for the month of November 1971. Since a number of actions must be taken with respect to such real property to deliver it at such future date in a different condition than it now is, it follows that any delay in satisfaction of the Agency's immediate need for possession will also deny satisfaction of the imminent need for possession and result in substantial economic and other harm to the Redevelopment Agency and the City and County of San Francisco, as well as the redeveloper and other parties involved in this significant construction project."

[5]The regulations under 42 United States Code section 3072, subdivision (3) are found in Urban Renewal Handbook RHA 7208.1, which was referred to in the prior decision (13 Cal.App.3d at p. 567). The regulations under section 4651, subdivision (5) are found in subsection (d) of section 42.120 and in paragraph (5) of subsection (a) of section 42.135 of the new regulations promulgated May 13, 1971 in Federal Register, volume 36, page 8785 at page 8796. Neither affects the plain meaning of the statute.

that it had not received relocation assistance and payments, but it did pray, "That plaintiff Redevelopment Agency be ordered and directed to comply with Federal law and regulations and to provide for the removal of defendant's business and property from the real property subject to the above action and to provide to defendant the relocation assistance and payments as provided by Federal laws and regulations." In its memorandum in support of its motion petitioner categorically states, "Defendant cannot under Federal law and regulations be removed from the subject property until plaintiff Redevelopment Agency gives a proper 90-day notice under section 3072, Title 42, United States Code, and *until the Redevelopment Agency complies with its obligations under Public Law 91-646* [42 U.S.C.A. §§ 4601-4655]." (Italics added.) This contention is renewed in connection with the petition for writ of mandamus. Nevertheless, a review of the pertinent statutes and regulations fails to reveal any express provision that the eviction or displacement of a business concern is dependent upon the prior tender of relocation assistance or expenses. Moreover, the petitioner has failed to allege facts which demonstrate that it has been denied any benefits to which it is entitled under the applicable law and regulations.

The judgment in condemnation signed and filed February 16, 1970 provided in part, "However, defendant herein [petitioner] and other occupants of the premises being acquired have reserved their rights to relocation expenses under applicable federal regulations." Petitioner's manager, in his declaration in support of the motion, alleged as follows: "The Milner Hotel property is also occupied by defendant 815 Mission Corporation which not only operates its business of the Milner Hotel but also operates a bar and an import and export business and a business under the fictitious name of Silver & Co. manufacturing and selling small kitchen devices and related articles on the premises. Thus, neither the resident guests of the Milner Hotel nor defendant 815 Mission Corporation have been relocated as provided by law. Defendant 815 Mission Corporation is also entitled to have its businesses relocated prior to its removal from the building." Similar allegations are contained in a supplemental declaration. It is obvious that these allegations establish no rights in petitioner unless the law requires, which it does not, the agency to relocate business concerns.

The provisions for relocation assistance are found in subsection (c) of section 105 of Title I of the Housing Act of 1949 as amended. (42 U.S.C.A. §1455, subd. (c).) The section delineates the requirements for federal aid to local public agencies, and in subsection (c) expressly requires relocation assistance.[6]

---

[6]Subsection (c) of section 105 (42 United States Code § 1455, subsec. (c)) provides: "(c)(1) There shall be a feasible method for the temporary relocation of individuals

As originally enacted subsection (c) of section 105 of the Slum Clearance and Community Development Title of the Housing Act of 1949 (July 15, 1949, ch. 338, tit. I, § 105; 63 Stat. 416; 42 U.S.C.A. § 1455) referred to "relocation of families displaced from the project area." In the Housing Act of 1964 (Sept. 2, 1964, Pub.L. 88-560, tit. 3, § 305(a)(1) and 305(b); 78 Stat. 786) the subsection was amended by providing for a reference to "individuals and families" in lieu of the reference to "families." At the same time provision was made for "a relocation assistance program" which for the first time recognized the need for relocation assistance to displaced "business concerns." The latter references were keyed in with amendments to the Small Business Act to provide for aid to small business concerns which were displaced by federally aided urban renewal projects. (*Id., § 305(c).* See also 1964 U.S. Code Cong. & Admin. News, pp. 3429-3430.)

When the subsection was cast in its present form in 1965 the specifics of the required relocation program were enlarged, and subsection (c) was divided into two parts. The first deals with the preexisting requirement

and families displaced from the urban renewal area, and there are or are being provided, in the urban renewal area or in other areas not generally less desirable in regard to public utilities and public and commercial facilities and at rents or prices within the financial means of the individuals and families displaced from the urban renewal area, decent, safe, and sanitary dwellings equal in number to the number of and available to such displaced individuals and families and reasonably accessible to their places of employment. The Secretary shall issue rules and regulations to aid in implementing the requirements of this subsection and in otherwise achieving the objectives of this subchapter. Such rules and regulations shall require that there be established, at the earliest practicable time, for each urban renewal project involving the displacement of individuals, families, and business concerns occupying property in the urban renewal area, a relocation assistance program which shall include such measures, facilities, and services as may be necessary or appropriate in order (A) to determine the needs of such individuals, families, and business concerns for relocation assistance; (B) to provide information and assistance to aid in relocation and otherwise minimize the hardships of displacement, including information as to real estate agencies, brokers, and boards in or near the urban renewal area which deal in residential or business property that might be appropriate for the relocating of displaced individuals, families, and business concerns; and (C) to assure the necessary coordination of relocation activities with other project activities and other planned or proposed governmental actions in the community which may affect the carrying out of the relocation program, particularly planned or proposed low-rent housing projects to be constructed in or near the urban renewal area.

"(2) As a condition to further assistance after August 10, 1965 with respect to each urban renewal project involving the displacement of individuals and families, the Secretary shall require, within a reasonable time prior to actual displacement, satisfactory assurance by the local public agency that decent, safe, and sanitary dwellings as required by the first sentence of this subsection are available for the relocation of each such individual or family.

"(3) Within one year after December 24, 1969, and every two years thereafter, the Secretary shall review each locality's relocation plan under this subsection and its effectiveness in carrying out such plan."

of a feasible method of relocation, and the second, which was added, imposes a requirement, as a condition to further aid, that dwellings are available for the relocation of "individuals and families" as required by the first part of the subsection. (See 1965 U.S. Code Cong. & Admin. News, pp. 2644-2645.) No mention was made of furnishing premises to relocate business concerns as a condition of further federal aid.

In 1969 paragraph "(3)" was added to subsection "(c)" (see fn. 6 above) and subsection "(h)" was added to section 105. It requires, unless waived by the secretary, the provision of an equal number of housing units for those demolished which were occupied by low and moderate income families. No such solicitude is demonstrated toward business concerns.

It is clear from the foregoing that the relocation assistance to be furnished "individuals and families" is of different quantity and degree than that to be furnished "business concerns." The provisions concerning the statutory intention to provide for the relocation of individuals and families before permitting eviction and displacement do not apply to business concerns.

In 1971 new legislation provided for uniform relocation assistance and uniform real property acquisition. The provisions adopted in connection with federal agencies were made applicable to federal assisted projects, both new,[7] and existing.[8] In the new legislation (Pub.L. 91-646, tits. I, II and III, §§ 101-305, Jan. 2, 1971, 84 Stat. 1894 et seq., 42 U.S.C.A. §§ 4601 et seq.) a distinction is again drawn between families and indi-

---

[7] 42 United States Code section 4630 provides: "Notwithstanding any other law, the head of a Federal agency shall not approve any grant to, or contract or agreement with, a State agency, under which Federal financial assistance will be available to pay all or part of the cost of any program or project which will result in the displacement of any person on or after January 2, 1971, unless he receives satisfactory assurances from such State agency that—(1) fair and reasonable relocation payments and assistance shall be provided to or for displaced persons, as are required to be provided by a Federal agency under sections 4622, 4623, and 4624 of this title; (2) relocation assistance programs offering the services described in section 4625 of this title shall be provided to such displaced persons; (3) within a reasonable period of time prior to displacement, decent, safe, and sanitary replacement dwellings will be available to displaced persons in accordance with section 4625(c)(3) of this title."

[8] 42 United States Code section 4631, subsection (c) provides: "(c) Any grant to, or contract or agreement with, a State agency executed before January 2, 1971, under which Federal financial assistance is available to pay all or part of the cost of any program or project which will result in the displacement of any person on or after January 2, 1971, shall be amended to include the cost of providing payments and services under sections 4630 and 4655 of this title. If the head of a Federal agency determines that it is necessary for the expeditious completion of a program or project he may advance to the State agency the Federal share of the cost of any payments or assistance by such State agency pursuant to sections 4626, 4630, 4635 and 4655 of this title."

viduals who are displaced from a dwelling, and a person (any individual, partnership, corporation or association) displaced from his place of business or farm operation. Although section 4630 (fn. 7 above) refers indiscriminately to "displaced persons," reference to "section 4625(c)(3)"[9] which is referred to in subsection "(3)" of section 4630 reflects that the requirement of the availability of "replacement dwellings" "within a reasonable period of time prior to displacement" only applies to dwellings for families and individuals. No such requirement is imposed for business concerns or farm operations. Similarly the provisions of sections 4623 and 4624 are limited to replacement housing, and do not apply to business concerns. Section 4622 (discussed below) distinguishes between elective relocation payments that may be made to one displaced from a dwelling (subsection (b)) and to one displaced from a business or farm operation (subsection (c)).

The following requirements found in section 4625 govern the relocation advisory services to be provided a displaced business concern: "(c) Each relocation assistance advisory program required by subsection (a) of this section shall include such measures, facilities, or services as may be necessary or appropriate in order to—

"(1) determine the need, if any, of displaced persons, for relocation assistance;

"(2) provide current and continuing information on the availability, prices, and rentals, of comparable decent, safe, and sanitary sales and rental housing, and of comparable commercial properties and locations for displaced businesses;

"(3) [not applicable. See footnote 9, and accompanying text].

"(4) assist a displaced person from his business or farm operation in obtaining and becoming established in a suitable replacement location;

"(5) supply information concerning Federal and State housing programs, disaster loan programs, and other Federal or State programs offering assistance to displaced persons; and

---

[9]This portion of subsection (c) of section 4625 provides: "(3) assure that, within a reasonable period of time, prior to displacement there will be available in areas not generally less desirable in regard to public utilities and public and commercial facilities and at rents or prices within the financial means of the families and individuals displaced, decent, safe, and sanitary dwellings, as defined by such Federal agency head, equal in number to the number of and available to such displaced persons who require such dwellings and reasonably accessible to their places of employment, except that the head of that Federal agency may prescribe by regulation situations when such assurances may be waived; . . . ."

"(6) provide other advisory services to displaced persons in order to minimize hardships to such persons in adjusting to relocation."

Regulations promulgated under the new law similarly distinguish between the services to be provided to those displaced from dwellings and those displaced in their business or farm operations. (See Rules and Regulations under the 1970 Act, 36 Fed. Reg., No. 93 (May 13, 1971) pp. 8785 et seq., particularly §§ 42.100-42.125, pp. 8794-8796.) Section 42.105 expressly recites, "Such program shall be administered so as to provide advisory services which offer maximum assistance, to minimize the hardship of displacement, and to assure that (a) all persons displaced from their dwellings are relocated into housing meeting the criteria described in § 42.120, and (b) all persons displaced from their places of business or farm operations are assisted in reestablishing with a minimum of delay and loss of earnings." Section 42.115 elaborates on the services set forth in the statute, but nowhere is there a requirement that the agency assure or furnish commensurate commercial property to that taken, before eviction or displacement may occur.

Petitioner has failed to show in what respects the agency has failed to maintain a relocation assistance advisory program, or what services he has been denied. As noted above, the declarations filed in support of its motion are purely conclusionary on this issue. On the other hand, the very notice under attack states, "We shall be pleased to assist you with respect to submitting a claim for relocation payments for which you may be eligible by virtue of vacating the premises. Please call [named representatives] for assistance in such matters." In its return to the alternative writ of mandate the agency has set forth copies of letters, in which assistance was tendered, addressed to petitioner's secretary in both his corporate and individual capacity.

Because the law does not specifically require the assistance as a condition precedent to the eviction and displacement of a business concern, and because, in any event, no factual issue has been properly tendered, no writ should issue against the order of possession on the ground that the agency failed to furnish the petitioner relocation assistance services.

Provisions for financial assistance to displaced individuals, families, businesses and nonprofit organizations were added to laws governing slum clearance and urban renewal in 1956 (Aug. 7, 1956, Pub.L., ch. 1029, tit. III, § 305, 70 Stat. 1100, 42 U.S.C.A. § 1456, subd. (f)), and was last amended and supplemented in 1965. (Aug. 10, 1965. Pub.L. 89-117, tit. I, § 101(i), tit. IV, §§ 404(a) and 404(b), (c), (1), 79 Stat. 453, 486, 42 U.S.C.A. §§ 1465 and 3074.) These provisions were repealed, and in effect reenacted January 2, 1971. (Uniform Relocation Assistance and

Real Property Acquisition Policies Act of 1970; Pub.L. 91-646, Jan. 2, 1971, 84 Stat. 1894 et seq., 42 U.S.C.A. §§ 4601 et seq.) The relocation payments which the provisions of section 4630 and section 4631, subsection (c) require to be furnished to a business concern on displacement because of an existing federally assisted project are set forth in section 4622, which provides in pertinent part: "(a) Whenever the acquisition of real property for a program or project undertaken by a Federal agency in any State will result in the displacement of any person on or after January 2, 1971, the head of such agency shall make a payment to any displaced person, upon proper application as approved by such agency head, for—

"(1) actual reasonable expenses in moving himself, his family, business, farm operation, or other personal property;

"(2) actual direct losses of tangible personal property as a result of moving or discontinuing a business or farm operation, but not to exceed an amount equal to the reasonable expenses that would have been required to relocate such property, as determined by the head of the agency; and

"(3) actual reasonable expenses in searching for a replacement business or farm.

"(c) Any displaced person eligible for payments under subsection (a) of this section who is displaced from his place of business or from his farm operation and who elects to accept the payment authorized by this subsection in lieu of the payment authorized by subsection (a) of this section, may receive a fixed payment in an amount equal to the average annual net earnings of the business or farm operation, except that such payment shall be not less than $2,500 nor more than $10,000. In the case of a business no payment shall be made under this subsection unless the head of the Federal agency is satisfied that the business (1) cannot be relocated without a substantial loss of its existing patronage, and (2) is not a part of a commercial enterprise having at least one other establishment not being acquired by the United States, which is engaged in the same or similar business. . . ."

Regulations under the 1970 act became effective May 13, 1971. (36 Fed. Reg., No. 93, pp. 8785-8798.) The regulations state: "These regulations are applicable to all acquisition and displacements occurring on or after January 2, 1971, and prior to July 1, 1972, to the extent that a State agency has furnished the Department of Housing and Urban Development with satisfactory assurances under § 42.30 of these regulations with respect to the federally assisted activity under which such acquisition or displacement takes place. The regulations on Relocation Payments appearing at

24 CFR Part 41 and at 35 F.R. 14307-14 (effective Sept. 10, 1970) will continue to apply to displacements occurring on or after January 2, 1971, and prior to July 1, 1972, to the extent that these regulations do not apply." No attempt has been made to determine whether petitioner is entitled to assistance under the prior law and regulations, or under the 1970 act and the new regulations because no significant difference in terms has been articulated in these proceedings.[10]

In its points and authorities in support of the petition for writ of mandate petitioner does not refer specifically to the matter of relocation payments. It does, however, refer to the 1970 act and a portion of the handbook which has been quoted at length in the margin (fn. 10 above). In its motion in the trial court, petitioner did pray for an order that the agency be directed "to provide to defendant [petitioner] the . . . payments

---

[10]In addition to the regulations referred to above the Urban Renewal Handbook, issued by the federal department contains provisions concerning relocation predicated on the applicable statutes and regulations. This handbook provided in part: "*Informational Statement* During project execution, the LPA shall deliver an Informational Statement to all families, individuals, business concerns, and nonprofit organizations occupying and/or owning property in the project area. The Informational Statement shall be of a more detailed and comprehensive nature than the informational material distributed during survey and planning.

. . . . . . . . .

"The Informational Statement for business concerns shall include the following:
"(1) Identification of project boundaries. If possible, a map or diagramatic sketch outlining the project area should be attached.
"(2) Statement that public action may result in displacement of the business concern, but that no one lawfully occupying property will be required to surrender possession without at least 90 days' written notice from the LPA.
"(3) Statement encouraging business concerns to contact and work with the LPA, and indicating the address, telephone number, and hours of the relocation office or other LPA office where relocation services will be provided and additional details may be obtained.
"(4) Description of the types of relocation payments available, including details regarding eligible moving expenses, maximum amounts for moving expenses and/or property loss, and eligibility requirements for a Small Business Displacement Payment.
"(5) Statement that relocation payments may be made only after completion of the move or discontinuance of the business and that claims must be filed with the LPA within 6 months of either occurrence.
"(6) Brief description of conditions governing a self-move.
"(7) Statement of requirements in connection with notification to the LPA of intention to move and submission of bids.
"(8) Summary of LPA's property management policy.
"(9) Summary of LPA's eviction policy.
"(10) Reference to assistance available from the Small Business Administration and, if applicable, local groups, and indication of any steps necessary to obtain the assistance.
"(11) Description of assistance LPA will furnish, in addition to the making of relocation payments."
(Urban Renewal Handbook (2/68) R.H.A. 72112.1, Relocation, ch. 3, § 1, pp. 2, 3 and 4.)

. . . provided by Federal laws and regulations." In its reply memorandum in the trial court petitioner first suggested that the relocation payments should be made. before eviction. It stated, "The Redevelopment Agency has not offered or made available to defendant [petitioner] any payments whatsoever as required by the 1970 Act. Defendant has received no relocation assistance from plaintiff. If defendant is ousted from the property before these payments are made it will be impossible to obtain the monies authorized by the 1970 Act from the Redevelopment Agency. It is well known that defendant and Louis J. Silver are out of favor with the Redevelopment Agency and its functionaries because they have been willing to assert and maintain their rights. Unless defendant is furnished the relocation assistance payments to which it is entitled under the 1970 Act, defendant will never receive these payments short of another lawsuit."

It is clear for several reasons that the making of a relocation payment is not a condition precedent to the demand for possession from, or the eviction of, the petitioner as a commercial occupant. In the first place there are no factual allegations in the record which establish either that petitioner has incurred moving or other expenses (§ 4622, subd. (a)), or that it has elected to accept or has qualified for an in lieu payment (§ 4622, subd. (c)), or that it has made any demand on the agency for either.

In the second place it is clear from the regulations that the claim for relocation payments is to be submitted and paid after displacement occurs. Section 42.55[11] provides in part, *"Basic eligibility conditions. (a) General. A person qualifies as a displaced person for purposes of establishing basic eligibility for a relocation payment if: (1) Such person moves from real property within the project area or moves his personal property from such real property . . . and [¶] (2) Such person is displaced as a result of (i) the acquisition of such real property, in whole or in part, for a project as further provided in paragraph (b) of this section, . . .; [¶] (3) . . . (b) Displacement by acquisition. Displacement as a result of the acquisition of real property includes displacement which is the result of: [¶] (1) The obtaining by the acquiring agency of title to or the right to possession of such real property for a project; [¶] (2) The written order of the acquiring agency to vacate such property for a project; . . ."* (Italics, other than in titles, are added.)

---

[11]References are to part 42 of subtitle A of title 24 of Code of Federal Regulations, as effective May 13, 1971, and published in volume 36, No. 93 of the Federal Register at pages 8786-8798 on that day. The regulations governing relocation payments under the prior law are found in parts 3 and 41 of subtitle A of title 24. There is no appreciable difference in the content of these regulations (cf. 24 C.F.R., §§ 3.3(e), 3.103(a) and (b), 3.108, 3.109, and §§ 41.22(a) and (b), 41.12, 41.13) except, as discussed in the text below, in connection with review (cf. 24 C.F.R., §3.104(e) and § 41.11 (c)).

Section 42.60 provides in part: *"Filing of claims.* [¶] (a) *General.* All claims shall be submitted to the State agency on the appropriate HUD form, supported by such documentation as may be required. . . . [¶] (b) *Time for filing claims.* Any claim for a payment [exception not applicable] shall be submitted to the State agency *within a period of six months after displacement of the claimant,* . . ." (Italics added.)

Section 42.65 provides in part, *"Actual reasonable moving expenses.* [¶] (a) *General.* . . . [¶] (b) *Requirements—Moving a business or farm operation.* Except as provided in this paragraph, no payment for actual reasonable moving expenses shall be made to a displaced person for moving his business or farm operation unless [there follows provisions for notice to the agency, and permission to inspect]: . . . [¶] (c) *Limitations.* . . . [¶] (d) *Documentation in support of a claim.* [¶] (1) *All claimants.* A claim for a payment under paragraph (a) of this section shall be supported by a bill or other evidence of *expenses incurred.* By prearrangement between the State agency, the site occupant, and the mover, evidenced in writing, the claimant or the mover may present an unpaid moving bill to the State agency, and the agency may pay the mover directly. [¶] (2) *Businesses and farm operations.* Each claim in excess of $500 for the costs incurred by a displaced person for moving his business or farm operation shall be supported by a bid (. . .) submitted to the State agency at least 15 days prior to the commencement of the move, from three reputable firms covering the moving costs involved. . . ."

Other provisions dealing with "Actual direct losses of tangible personal property" (§ 42.70), "Actual Reasonable expenses in searching for a replacement business or farm" (§ 42.75), and "Alternate payments—business and farm operations" (§ 42.85) do not in any way indicate that payment is a prerequisite to actual eviction. The provisions for payment of claims are found in section 42.175 which reads, *"Prompt payment.* [¶] A payment shall be made by the State agency as promptly as possible after a person's eligibility has been determined in accordance with the regulations in this part. Advance payments may be made in hardship cases where the State agency determines such advances to be appropriate under the regulations in this part."

Finally, it should be noted that the review of claims (§ 42.170) and appeals procedure (§ 42.190) is expressly left to administrative discretion. The state agency determines the validity of and the amount to be paid on the claim in the first instance, and the displaced person, if aggrieved, may have his claim reviewed in accordance with procedures established by the state agency. If still dissatisfied he may seek review by the Secretary of Housing and Urban Development. Under the provisions found in sub-

section (e) of repealed section 1465 of Title 42, U.S.C., the rule making power embraced the authority to provide "that determinations of any duly designated officer or agency as to eligibility for and the amount of relocation assistance authorized by this section (§ 1465) shall be final and conclusive for any purposes and not subject to redetermination by any court or any other officer. . . ." (See also 24 C.F.R., § 3.104(c) and § 41.11(c).) Under these provisions it has been held that Congress had barred the courts from participating in the award of removal expenses. (See *Fountain* v. *United States* (1970) 427 F.2d 759, 761 [192 Ct.Cl. 495].) The 1970 Act does not include such language in conferring the rule making power (42 U.S.C.A. § 4635). It is unnecessary to determine whether there can be court review under the new law and regulations, because, in any event, there is a well defined administrative remedy which the displaced person should follow in seeking establishment of a claim for relocation payments. It is obvious that it was nowhere intended by law or regulation that the eviction or displacement should be held up while the former owner or tenant pursued that remedy.

It is concluded that the petitioner has failed to show a basis for setting aside the demand or the order for possession on the grounds that the agency has failed to provide relocation assistance or failed to make relocation payments.

IV

Nevertheless, it should be noted that it generally has been recognized that the failure to properly provide for the relocation of individuals or families who will be displaced from their dwellings is a ground for enjoining eviction proceedings. (See *Norwalk Core* v. *Norwalk Redevelopment Agency* (2d Cir. 1968) 395 F.2d 920, 932-937 [8 A.L.R.Fed. 388]; *Western Addition Community Organization* v. *Weaver* (N.D.Cal. 1968) 294 F.Supp. 433, 435-437; and Tenants and Owners in Opposition for Redevelopment ("*TOOR*") et al. v. United States Department of Housing and Urban Development et al. (N.D.Cal. No. C-69 324 SAW) as referred to in these proceedings. Cf. *Talbot* v. *Romney* (S.D.N.Y. 1970) 321 F.Supp. 458, 463-467; and *Western Addition Community Organization* v. *Romney* (N.D.Cal. 1969) 320 F.Supp. 308, 312-313. Note also, *Johnson* v. *Redevelopment Agency of City of Oakland, Cal.* (9th Cir. 1963) 317 F.2d 872, 874, which has been distinguished in *Norwalk Core* v. *Norwalk Redevelopment Agency, supra,* 395 F.2d at p. 936; and in *Western Addition Community Organization* v. *Weaver, supra,* 294 F.Supp. at pp. 443-445.) Similar relief has been extended to business concerns which were threatened with displacement. (See *M. M. Crockin Co.* v. *Portsmouth Redevelopment & H. Auth.* (4th Cir. 1971) 437 F.2d 784, 788-789; and *Home Furn. Co.*

*of Charlotte* v. *United States D. of H.U.D.* (W.D.N.C. 1971) 324 F.Supp. 1401, 1404.) In the first case the court reversed a dismissal by the district court and ordered it to issue a temporary injunction against the sale to another of property which formerly housed a portion of the plaintiff's business, until a determination could be made as to whether the relocation plan was adequate, and, if adequate, whether the local agency was executing it properly. In the latter case the court issued an order against disturbing the business concerns in their tenancies until the court determined whether there was an effective program for relocation assistance to such commercial tenants.

In the case from Portsmouth, Virginia, the court referred to the provisions of subdivision (c) of section 1455 (see fn. 6 above, and cf. 42 U.S.C.A. § 4625, subd. (c)), and stated: "Nor should the statute be read as narrowly as the defendants suggest [that "the requirements of 42 U.S.C.A., § 1455(c) (1) have been satisfied by an approved temporary relocation plan that will furnish information to businesses in need of relocation assistance"]. To be sure, it requres a local public authority contracting with HUD to furnish information that will aid businesses to relocate, but it also requires much more. In plain terms, it directs the Secretary to issue regulations that will require the redevelopment agency to include in its plan measures, facilities, and services '(A) to determine the needs of . . . business concerns for relocation assistance; (B) to provide . . . assistance to aid in relocation and otherwise minimize the hardships of displacement . . . and (C) to assure the necessary coordination of relocation activities with other project activities. . . .' " (437 F.2d at p. 789.) The court concluded, "Crockin is entitled to judicial review of HUD's action in initially approving PRHA's plan and also HUD's administrative review under § 1455(c) (3)." (*Id.,* fn. omitted.)

In the case from Charlotte, North Carolina, the court applied the same section, and noted, "From the affidavits and depositions in the file it is apparent . . . that the sum of the results of the efforts of the Commission has been to lend a sympathetic ear and to provide lists of abandoned and vacant property which might be considered by the plaintiffs as relocation sites, and to provide help in getting loans which the program calls for." (324 F.Supp. at p. 1403.) In restraining eviction pending development of an effective relocation assistance program for business concerns, the court stated: "At the same time, plaintiffs must bear in mind that the question whether relocation assistance is 'effective' is a question for the court to determine under all the circumstances; that the suitableness of a relocation site and the effectiveness of the relocation assistance are objective facts rather than matters of personal judgment by plaintiffs; and that the plain-

tiffs share the burden of continued efforts to find new locations for their operations." (*Id.*, p. 1404.)

The foregoing precedents may be distinguished on their facts. In the *Portsmouth* case the redevelopment project was taking and demolishing a wing of the plaintiff's store which it held with the remaining modern premises under a single long term lease. In recognition of this fact the redevelopment agency allegedly agreed to permit separate bids for the property involved so that plaintiff could bid it in and redevelop it with the remaining premises, and, in turn, the plaintiff waived some severance damages it might otherwise have recovered upon the taking of its leasehold interest in the portion to be redeveloped. Nevertheless, the agency had proceeded to accept a joint bid of a third person for the parcel in question and another parcel. Plaintiff claimed a denial of equal protection because it had been deprived of a privilege given other affected landowners, and a denial of due process by the breach of the alleged agreement. It was on the whole record that the interlocutory injunction was granted. (437 F.2d at pp. 789-791.)

In the *Charlotte* case the court also noted, "It further appears as a realistic matter that there are not enough sites in central Charlotte to which the various businesses involved in this project could be moved, and that the City and the Redevelopment Commission may have underestimated their duty under the law of the land." (324 F.Supp. at p. 1403.) Insofar as the court implies that there is an absolute duty to relocate business concerns, its conclusions are inconsistent with the law as it has been analyzed above in this opinion. From the conclusions (*id.*, p. 1404) it would appear that the decision stands for the proposition that an injunction would be granted when there was no approved relocation assistance plan in existence for business concerns.

In this case no facts have been alleged commensurate with those found in the foregoing cases. The bare conclusions alleged by petitioner would not give rise to the intervention of equitable relief even if the state court had jurisdiction to grant it.

In *Norwalk Core* v. *Norwalk Redevelopment Agency, supra,* the court held that judicial review of agency action under section 105(c) of the Housing and Urban Development Act (42 U.S.C.A. § 1455, subd. (c)) was available to families about to be displaced (395 F.2d at p. 936). It also pronounced the following caveat: "This does not mean, of course, that the courts are to intervene in relocation activities at the behest of every displacee disappointed in his relocation. Familiar doctrines limit the occasions on which particular judicial remedies, if any, are appropriate. In determining whether there has been compliance with section 105(c) of the

Act, courts will evaluate agency efforts and success at relocation with a realistic awareness of the problems facing urban renewal programs. Objections by individual displacees based on too literal an interpretation of the Act's standards could unnecessarily interfere with programs of benefit to the entire community." (*Id.*, p. 937.) So here the petitioner seeks to interpret the act's standards beyond their literal meaning, and has failed to allege facts which demonstrate that the agency has failed to make realistic efforts to assist in relocation.

It is obvious from a review of the applicable law and regulations that the question of whether there has been an effective plan for relocation assistance under the federal law, is to be determined, in the first instance, by the Secretary of Housing and Urban Development. He cannot be made a party to the proceedings in the state court without his consent. It would therefore be improper to conduct the review contemplated by the *Portsmouth* case in these proceedings, or in the proceedings pending in the trial court. If there are facts, unpleaded, which would warrant setting aside the demand for possession, or the order for possession, the appropriate forum would be a federal court with jurisdiction over both the secretary and the local agency.

The alternative writs are discharged, and the petition for peremptory writs of mandamus and prohibition is denied.

Elkington, J., and Devine, J.,* concurred.

A petition for a rehearing was denied January 26, 1972, and petitioner's application for a hearing by the Supreme Court was denied March 8, 1972.

---

*Assigned by the Chairman of the Judicial Council.