HOUSING AUTHORITY OF the CITY
OF OMAHA, NEBRASKA, et al.,
Appellees,

v.

UNITED STATES HOUSING AUTHOR·
ITY, etc., et al.,
and

National Tenants Organization, et al.,
Appellants.

Nos. 72–1102, 72–1185.

United States Court of Appeals,
Eighth Circuit.

Submitted May 11, 1972.

Decided Sept. 28, 1972.

Rehearing and Rehearing En Banc
Denied Oct. 26, 1972.

Alvin Hirshen, National Housing and Economic Development Law Project, Earl Warren Legal Institute, Berkeley, Cal., for National Tenants Organization, and others.

Patrick W. O'Brien, Chicago, Ill., for Housing Authority of the City of Omaha, Neb., and others.

Thomas G. Wilson, Atty., Dept. of Justice, Washington, D. C., for U.S. Housing Authority and others.

Before VOGEL, LAY and BRIGHT, Circuit Judges.

LAY, Circuit Judge.

At issue is the authority of the Department of Housing and Urban Development to promulgate Regulations RHM 7465.8 and RHM 7465.9 (hereinafter referred to as Circulars 8 and 9), under the United States Housing Act of 1937, as amended, 42 U.S.C. §§ 1401–1436. The district court enjoined the implementation of the regulations holding that (1) they were issued in violation of the Administrative Procedure Act, 5 U.S.C. § 553(b), requiring publication of general notice of the proposed rules in the Federal Register and (2) they were invalid under 42 U.S.C. § 1401, the so-called "local autonomy amendment" of the Housing Act. 54 F.R.D. 402 (D.Neb.1972). We find this holding to be error and vacate the district court's order.

On February 22, 1971, HUD issued Circulars RHM 7465.8 and RHM 7465.9 (Circulars 8 and 9) pursuant to its apparent authority under the United States Housing Act, 42 U.S.C. § 1401 et seq.[1] Circular 8 basically requires that the leases used by the housing authorities in renting to the tenants recognize certain "minimum" rights and obligations of the parties. Circular 9 in essence erects the procedural and substantive safeguards attendant to the settling of tenant grievances which are recognized in Circular 8. It is uncontroverted that HUD did not publish general notice in the Federal Register of its intent to develop the rules which were contained in these issued circulars.

Ten local housing authorities across the country later joined by fourteen others,[2] brought a class suit in the Dis-

---

1. The background leading up to the issuance of the circulars may be briefly stated. During 1969 a number of various organizations interested in the affairs of public housing tenants, and particularly the National Tenants Organization (NTO), set about to urge the Department of Housing and Urban Development (HUD) to issue a "Tenant Bill of Rights." This endeavor culminated in HUD convening a Conference on Tenants Rights and Responsibilities held in Washington, D. C., in December 1969. Out of that conference grew an *ad hoc* committee chaired by HUD, which included NTO and the National Association of Housing and Development Officials (NAHRO), the purpose of which was to develop a model lease and grievance procedure for low rent public housing. The alleged importance of NAHRO as a member of this drafting committee was that it represented, at least as a national spokesman, between one-third and one-half of all the local housing authorities in the country. Neither NAHRO nor NTO were legal agents for their respective memberships and could not mandatorily bind them as to their mutual discussions.

Thereafter NAHRO, NTO and HUD conducted a series of meetings with the goal of eventually drafting a model lease agreement and grievance procedure. After each meeting new drafts were prepared by HUD based on the recommendations of the task force and were sent to NTO and NAHRO for comment. However, at no time prior to the issuance of the regulations by HUD did NAHRO circulate to its membership the texts of these drafts. NAHRO did set forth a history of the negotiations in its information service bulletin which was sent to all its members on December 21, 1970. A tentative agreement between the two organizations, NAHRO and NTO, was reached on November 5, 1970. Further proceedings were held to alleviate certain concerns expressed by a NAHRO committee.

2. The named plaintiffs are: Housing Authority of the City of Omaha, Nebraska; Mobile Housing Board, Mobile, Alabama; Imperial Valley Coordinated Housing

trict of Nebraska against HUD alleging that the circulars were issued in violation of the Administrative Procedure Act, 5 U.S.C. § 553, and that they exceeded the limits of rule-making power authorized to HUD by Congress.

HUD answered and counterclaimed seeking declaratory relief that the regulations were valid. Thereafter the NTO, local tenant organizations and tenants of housing projects operated by plaintiffs were permitted to intervene pursuant to Rule 24(b)(2) Fed.R.Civ.P. The respective parties each sought a summary judgment and a motion for preliminary injunction. The district court ruled in plaintiffs' favor granting the motion for summary judgment declaring the challenged regulations invalid and enjoining their enforcement. HUD and the intervenors filed this appeal.

Under § 10(a) of the United States Housing Act of 1937, 50 Stat. 891, as amended, 42 U.S.C. § 1410(a) (1970), HUD is authorized to enter into an Annual Contributions Contract (ACC) with local housing authorities. Under this contract HUD furnishes a certain amount of money to the local authorities over a period of years. Section 8 of the Housing Act of 1937, 42 U.S.C. § 1408, provides HUD with its general rule-making power which gives HUD the authority to "make, amend, and rescind such rules and regulations as may be necessary to carry out the provisions of this chapter." Under this rule-making power HUD has issued a Low-Rent Management Manual. The manual "contains

requirements that supplement the provisions of the annual contributions contract applicable to project management." Thorpe v. Housing Authority of the City of Durham, 393 U.S. 268, 275, 89 S.Ct. 518, 522, 21 L.Ed.2d 474 (1969).

In essence, Circular 8 requires that the local housing authorities incorporate in their leases that rental payments must be accepted without regard to any other monies owed by the tenant; that eligibility requirements and standards for increasing or decreasing rent must be outlined; that reciprocal duties of both the tenant and landlord must be set forth with respect to using reasonable care in maintaining the premises; that rent shall abate if hazardous defects are not repaired or other accommodations provided within 72 hours following notice to the landlord; that the landlord may inspect the premises only during reasonable hours upon written notice and the tenant may be present at any such inspection; that notices under the lease must be in writing and either delivered personally or by certified mail; that termination of the lease may be only for good cause; and that the tenant must be given the reasons for the eviction at a private conference and permitted the opportunity to reply at a subsequent hearing.

Circular 9 basically requires that a tenant be afforded an administrative hearing before an impartial board or official whenever the lease or the local housing authorities' regulations, policies or practices are alleged to be violated; the tenant must be given notice of the

Authorities, Brawley, California; Housing Authority of the County of Contra Costa, California; Housing Authority of the City of New Haven, Connecticut; Rock Island County Housing Authority, Illinois; Paintsville Municipal Housing Commission of Paintsville, Kentucky; Housing Authority of the City of Monroe, Louisiana; Cambridge Housing Authority, Cambridge, Massachusetts; Quincy Housing Authority, Quincy, Massachusetts; Housing Commission of the City of River Rouge, Michigan; Housing Authority of the City of Biloxi, Mississippi; Housing Authority of the City of Reno,

Nevada; Housing Authority of the City of Elizabeth, New Jersey; Ironton Metropolitan Housing Authority of Ironton, Ohio; Housing Authority of the Choctaw Nation of Oklahoma; Housing Authority of Hugo, Oklahoma; Housing Authority of County of Clackamas, Oregon; Housing Authority of Douglas County, Oregon; Oglala Sioux Housing Authority, Pine Ridge, South Dakota; Bristol, Tennessee Housing Authority; Jackson Housing Authority, Jackson, Tennessee; Housing Authority of the Metropolitan Government of Nashville and Davidson County, Tennessee.

rules governing the hearing and is entitled to have counsel present and to present witnesses and to cross-examine; all decisions are to be in writing with a decision adverse to the local housing authority binding (unless arbitrary or capricious) but a decision adverse to the tenant may be judicially appealed by either party.

The declaration of Section 1 of the United States Housing Act of 1937, 50 Stat. 888, 42 U.S.C. § 1401, declares it to be "the policy of the United States to promote the general welfare . . . and to remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe and sanitary dwellings for families of low income."

Section 2 of the Housing Act of 1949, 63 Stat. 413, 42 U.S.C. § 1441, specifies that all agencies "having powers, functions, or duties with respect to housing . . . exercise their powers, functions, and duties under this or any other law, consistently with the national housing policy declared by this Act and in such manner as will facilitate sustained progress in attaining the national housing objective hereby established . . ."

When the circulars are considered in light of the statutory language, we find it self-evident that their requirements have a "reasonable relationship to the purposes for which HUD's rule-making power was authorized." Thorpe v. Housing Authority of the City of Durham, supra at 281, 89 S.Ct. at 526.[3]

However, the district court held Circulars 8 and 9 invalid on the basis that they violated Section 1 of the Act, which reads in part:

"It is the policy of the United States to vest in the local public housing agencies the maximum amount of responsibility in the administration of the low-rent housing program, including responsibility for the establishment of rents and eligibility requirements (subject to the approval of the Authority), with due consideration to accomplishing the objectives of this chapter while effecting economies." Section 1 of the United States Housing Act of 1937, 50 Stat. 888, as amended by § 501 of the Housing Act of 1959, 73 Stat. 679, 42 U.S.C. § 1401.

The trial court generally concluded that the circulars contravened congressional policy by placing HUD in the position of dictating day-to-day management procedure. We acknowledge that HUD's promulgation of these rules cannot be interpretive support as to the extension of its own power. Social Security Board v. Nierotko, 327 U.S. 358, 369, 66 S.Ct. 637, 90 L.Ed. 718 (1946); Stark v. Wickard, 321 U.S. 288, 309–310, 64 S.Ct. 559, 88 L.Ed. 733 (1944); United States v. New England Coal and Coke Company, 318 F.2d 138, 143 (1 Cir. 1963); Stark v. Brannan, 82 F.Supp. 614, 618 (D.D.C.1949), aff'd 87 U.S. App.D.C. 388, 185 F.2d 871 (1950), aff'd 342 U.S. 451, 72 S.Ct. 433, 96 L.Ed. 497 (1952). On the other hand, HUD's prior exercise of its rule-making power does give persuasive force as to defining its responsibility in carrying out the objectives of the Act.[4] Such a depart-

3. In issuing the model lease and grievance procedures HUD's Assistant Secretary Norman V. Watson observed:

"Hopefully, however, these procedures will eliminate much of the landlord-tenant hostility and antagonism that characterized many local programs in recent years. This should reduce total operating costs in the future. Moreover, the elimination of conflict will improve the quality of the living environment and for this purpose the Congress has authorized HUD to make operating sub-sidies available to Local Housing Authorities. The combination of subsidy and better management-tenant relationships should improve . . . Local Housing Authorities' financial position." Letter of Norman V. Watson, Feb. 8, 1971, to Eneas J. Kane, President of the National Association of Housing and Redevelopment Officials.

4. Pursuant to its rule-making policy HUD's low-rent housing manual already requires that programs be developed for involving tenants in the planning process

mental construction of its own enabling legislation is to be given great weight when it enhances the general purposes and policies underlying the Act. See Zuber v. Allen, 396 U.S. 168, 192, 90 S. Ct. 314, 24 L.Ed.2d 345 (1969); Murphy Oil Corp. v. Hickel, 439 F.2d 417, 422 (8 Cir. 1971).

We have no difficulty joining other decisions [5] in approving Circular 9 as it sets forth the mandatory policy requiring certain prescribed grievance procedures. There exists little difference between the notice and hearing requirements approved in Thorpe v. Housing Authority of the City of Durham, supra, and the requirements included in Circular 9.[6] As the district court stated, Circular 9 does not basically alter the lease; furthermore, it is clear that the details in carrying out these procedures are left entirely in the hands of the local authorities. Moreover, although these grievance procedures may create a greater burden on the local housing authorities, the regulations do not inject HUD into day-by-day operations of the housing authority. First, HUD has nothing to do with the implementation or detailed operation of the procedural process prescribed. Secondly, these grievance procedures may be invoked only when the local authority is alleged to have violated the actual terms of the lease.

■ Both parties have recited legislative history of the amendment at length. The local housing authority cites remarks of Senators Clark and Proxmire, 105 Cong.Rec. 1868–1869 (1959), which emphasize that the amendment to § 1401 was intended to prevent HUD from interfering with the local authorities. On the other hand the National Tenants Organization emphasizes the view of Dr. Wheaton, representing the National Housing Conference, where he stated:

"It is the purpose of both H.R. 2357 and H.R. 2385 to make the low-rent program work by restoring to the local housing authorities their appropriate responsibility for local decisions in the day-to-day operation of their projects. But *in recognizing local responsibility neither of these bills relinquish any of the Federal controls or sanctions which may prove necessary to assure compliance with the terms of the act and to prevent fraud or gross waste and extravagance by the local housing authorities.*" (Emphasis ours.) Hearings on H.R. 2357, 2385 Before the Subcommittee on Housing of the Committee on Banking and Currency, 86th Cong., 1st Sess. 197–198 (Jan. 1959).[7]

which will consider such needs as changes in management policy and expanded services and facilities (RHA 7485.1a(3)(b)); the lease must warrant that the dwelling complies with local building and housing codes (RHA 7430.1 ch. 3, § 2, ¶ 3e); without HUD approval, only one local housing authority employee may live in a project of over 100 or more dwelling units (RHA 7465.1 ¶ 11a); and certain regulations must be followed with respect to equal employment and discrimination in housing (RHA 7401.1 ch. 9, § 1).

5. Although not passing on this precise question, three courts have given tacit approval to Circular 9. Glover v. Housing Authority of City of Bessemer, 444 F.2d 158 (5 Cir.1971); Housing Authority of City of Milwaukee v. Mosby, 192 N.W. 2d 913 (Wis.1972); Chicago Housing Authority v. Harris, 49 Ill.2d 274, 275 N.E.2d 353 (1971).

6. The Supreme Court recognized that the local authorities may decide to grant a grievance hearing to an aggrieved tenant. However, the Court went on to note that "if the procedure followed by the Authority proves inadequate, HUD may well decide to provide for an appropriate hearing." Thorpe v. Housing Authority of the City of Durham, 393 U.S. at 284 n. 48, 89 S.Ct. 518, at 527, 21 L.Ed.2d 474.

7. The Senate Report gives support to Dr. Wheaton's view:

"The legislative change suggested by the Commissioner appears in section 401 of the bill. This change is intended to relieve the Public Housing Administration of much of the detail of policing and supervising local managment operations and of placing responsibility for these matters on the local public agencies." S.Rep.No.41, 86th Cong., 1st Sess. 36 (1959).

■ HUD urges that the amendment was designed primarily to give greater responsibility to local authorities on auditing and budgeting review. This may well have been the initial motivation. However, the end legislation is much broader, particularly as it must be read with Section 2(6) of the Act which defines administration.[8] See H.R.Rep. No. 566, 86th Cong., 1st Sess. 48–49 (1959). Nevertheless, we think it clear that HUD does have the ultimate supervision and authority in carrying out the objectives of the Housing Act. We conclude this to be true by the express terms of the statute itself as well as by the legislative history set forth above.

■ In interpreting Section 1401, we find it significant that (1) there was not a complete transfer of authority to the local housing authorities,[9] (2) although "administration" is not confined to budgetary acts and may necessarily be related to policy decisions, the ultimate responsibility for policy lies with the National Authority to achieve uniformity in fulfilling the objectives of the Act, and (3) where HUD determines that local authorities have failed to act or have acted in an inimical way to the objectives of the Act, that the ultimate authority is vested in HUD to set overall policy. When the latter occurs the real limitation to HUD's authority to act is whether its policies are reasonably related to carrying out Congress' expressed objectives to the low-rent housing program.

■ The background history leading up to the promulgation of the circulars clearly reflects a national concern as to the inequities in public housing throughout the nation.[10] Although the congressional mandate given to HUD

In taking into account the above legislative history we adhere to the general principle that committee reports represent the most persuasive indicia of congressional intent. See Zuber v. Allen, 396 U.S. 168, 186, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969); United States v. O'Brian, 391 U.S. 367, 385, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); Northern States Power Co. v. State of Minnesota, 447 F.2d 1143, 1152 (8 Cir. 1971), aff'd, 405 U.S. 1035 (1972); see generally, G. Folsom, Legislative History, 33 (1972).

8. "The term 'administration' means any or all undertakings necessary for management, operation, maintenance, or financing . . . subsequent to physical completion." 42 U.S.C. § 1402(6).

9. "Your committee considered carefully the question of whether to bestow more local autonomy by an express statutory transfer of authority. We concluded that such action was unnecessary in view of assurances by the Public Housing Administration that the desired objectives could be accomplished by changes in administrative procedures and practices." H.R.Rep.No.86, 86th Cong., 1st Sess. 30 (1959).

10. See Schoshinski, Public Landlords and Tenants: A Survey of Developing Law, 1969 Duke L.J. 399; Public Housing, 22 Vand.L.Rev. 875 (1969).

HUD believed the grievance procedure established in Circular 9 was needed to help alleviate the friction and strain in tenant-management relations which would thereby "promote improved housing environment to the advantage of the low-rent public housing program. . . ." (RHM 7465.9) The underlying facts of, for example, the strains between management and tenants which HUD claims have partly justified the development of these circulars must be presumed to exist. Thompson v. Consolidated Gas Utilities Corp., 300 U.S. 55, 69, 57 S.Ct. 364, 81 L.Ed. 510 (1937). Furthermore, whether or not HUD is correct in believing that the circulars will improve tenant-management relations and the public housing environment is not for a court to predict. Our function is not to act as a supercommission. American Trucking Associations, Inc. v. United States, 344 U.S. 298, 308–309, 73 S.Ct. 307, 97 L.Ed. 337 (1953). As the Supreme Court noted in Federal Security Administrator v. Quacker Oats Co., 318 U.S. 218, 227–228, 63 S.Ct. 589, 595, 87 L.Ed. 724 (1943):

"[W]e have repeatedly emphasized the scope that must be allowed to the discretion and informed judgment of an expert administrative body. [cases omitted] These considerations are especially appropriate where the review is of regulations of general application adopted by an administrative agency under its rule-making power in carrying out the policy of a statute with whose enforcement it is charged."

is that maximum responsibility in the administration of the program should be given to the local authority, we find nothing within the legislative history which precludes HUD's overall supervision and exercise of power where local authorities have failed to measure up to the objectives of the Act. In fact, the legislative history reads to the contrary.[11] HUD has a responsibility to police performance of its contracts so that decent, safe and sanitary character of public dwellings is maintained in accordance with the purposes of the Housing Act. See Knox Hill Tenant Council v. Washington, 145 U.S.App.D.C. 122, 448 F.2d 1045, 1048 (1971).[12] Although a policy declaration as contained in Section 1401 is entitled to judicial respect upon construction of the statute, it cannot restrict an agency's responsibility and concomitant authority to protect and further the purposes and objectives of the Act as expressly evidenced by Section 1408. Cf. Duke Power Company v. FPC, 130 U.S.App.D.C. 389, 401 F.2d 930, 938 (1968).

NOTICE

Finding that the circulars are within HUD's statutory rule-making authority, we must still determine whether the circulars are unlawful by reason of HUD's failure to comply with the notice provision of Section 4 of the Administrative Procedure Act (APA), 5 U.S.C. § 553.[13]

Cf. Lewis v. Martin, 397 U.S. 552, 559, 90 S.Ct. 1282, 25 L.Ed.2d 561 (1970); Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); Zemel v. Rusk, 381 U.S. 1, 11, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965). In Thorpe v. Housing Authority of the City of Durham, 393 U.S. 268, 281, 89 S.Ct. 518, 525, 21 L.Ed.2d 474 (1969), the Court dispelled any doubts that the HUD regulation at issue was authorized by the statute by saying:

"One of the specific purposes of the federal housing act is to provide 'a decent home and a suitable living environment for every American family' that lacks the financial means of providing such a home without governmental aid. A procedure requiring housing authorities to explain why they are evicting a tenant who is apparently among those people in need of such assistance certainly furthers this goal. We therefore cannot hold that the circular's requirements bear no reasonable relationship to the purposes for which HUD's rule-making power was authorized."

Here HUD seeks to institute new lease provisions which primarily recognize the rights of tenants while at the same time not ignoring the rights of landlords, and which institute new grievance procedures designed to reduce friction and courtroom litigation. These objectives, in turn, are alleged to promote the larger goals of better tenant-management relations and better public housing environments which doubtless conform with the objectives of the Housing Act. It is not unreasonable or arbitrary to expect that the new lease provisions and grievance procedures may bring about these desired goals. See Housing Authority of City of Milwaukee v. Mosby, 192 N.W.2d 913 (Wis.1972).

11. Even the remarks of Senator Clark lend recognition to HUD's ability to set overall policy. For although HUD is to keep a "hands off" position, this is effective only "unless and until you [HUD] have reason to believe that they [local housing authorities] are not performing their public duties." 105 Cong.Rec. 1869 (1959).

12. HUD additionally argues that the circulars are authorized since many of them are constitutionally mandated. This argument begs the question. Cf. Lefcoe, HUD's Authority to Mandate Tenants' Rights in Public Housing, 80 Yale L.J. 463, 492 (1971). Whether the circular provisions are constitutionally sanctioned is not relevant to the question of whether they are authorized under § 1401. Cf. Arizona State Department of Public Welfare v. Department of HEW, 449 F.2d 456, 468 (9 Cir. 1971), cert. denied, 405 U.S. 919 (1972); Almenares v. Wyman, 334 F.Supp. 512, 521 (S.D.N.Y. 1971), aff'd 453 F.2d 1075 (2 Cir. 1971), cert. denied, 405 U.S. 944, 92 S.Ct. 962, 30 L.Ed.2d 815 (1972).

13. The district court found that there exists an issue of fact as to whether certain plaintiffs may have had actual notice of the proposed rules thereby possibly avoiding the specific requirements of publication under the Act. N.L.R.B. v. Chelsea Clock Co., 411 F.2d 189 (1 Cir. 1969); Kessler v. F.C.C., 117 U.S. App.D.C. 130, 326 F.2d 673, 690 (1963); United States v. Aarons, 310 F.2d 341 (2 Cir. 1962); Owensboro On the Air v.

Title 5 U.S.C. § 553(b) requires notice of proposed rule-making to be published in the Federal Register by the agency in question. Section 553(a) provides in relevant part that:

"This section applies, according to the provisions thereof, except to the extent that there is involved—

. . . . . .

(2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts."

The exemptions of matters under Section 553(a)(2) relating to "public benefits," could conceivably include virtually every activity of government. However, since an expansive reading of the exemption clause could easily carve the heart out of the notice provisions of Section 553, it is fairly obvious that Congress did not intend for the exemptions to be interpreted that broadly. The legislative history tends to support this logic. The Senate Judiciary Committee reported on its version (S.7) of the Administrative Procedure Act as follows: "It should be noted . . . that the exceptions apply only 'to the extent' that the excepted subjects are *directly* involved." (Emphasis ours.) S.Rep. 752, 79th Cong., 1st Sess. 13 (1945). Not only were exempted regulations limited to those where the excepted subjects were directly involved, but also the excepted subjects appeared to be limited in their scope to those where the government had a "proprietary" or other unique interest. The specific exemption for "public contracts" seems to have developed from a concern to avoid having the notice section applied to minimum wage determinations of the Department of Labor in connection with public contracts. S.Doc. 248, 79th Cong., 2d Sess. 17–18 (1946). In 1946 the Department of Labor was authorized to issue public

contracts under the Davis-Bacon Act (40 U.S.C. § 276a et seq.) and the Walsh-Healey Act (41 U.S.C. §§ 35–45). In Perkins v. Lukens Steel Co., 310 U.S. 113, 129, 60 S.Ct. 869, 84 L.Ed. 1108 (1940), the Court held that the government must be free from vexatious restraints which interfere with the manner in which it may dispatch its own internal affairs. To insure that the notice provisions of the APA would not be used in a similar manner to restrain the government's administration of public contracts, Congress included the exemption. See Reich, Administrative Procedure Act: Analysis of its Requirement as to Rule-Making, 33 A.B.A.J. 315, 317 (1947).

The Annual Contributions Contract represents a governmental "proprietary interest," in that it effectuates the government's stewardship over public housing projects which are purchased with public funds. The Housing Act makes this clear. If any local housing authority fails to adhere to its obligations under the contract, HUD can reduce or terminate the annual contributions payable under such contract [14] or even assume management of the project.[15]

In a somewhat analogous situation, the Federal Housing Administration (FHA) has offered mortgages at very reduced interest rates to industry to encourage the building of low-rent housing. In exchange for the mortgages, the FHA implemented a number of extensive regulations covering the activities of the mortgagor. Among these were regulations controlling and supervising rents. One regulated project, Chenango Court, Inc., applied to FHA for an increase in the rents which was approved accordingly but without any prior notice. In a challenge to the action in Langevin v. Chenango Court, Inc., 447 F.2d 296, 300 (2 Cir. 1971), the court

United States, 104 U.S.App.D.C. 391, 262 F.2d 702, 708 (1958). *Contra*, Hotch v. United States, 212 F.2d 280, 283, 14 Alaska 594 (9 Cir. 1954). However, in view of its conclusion that HUD had no power under Section 1401, the district

court found it unnecessary to pass on the factual notice issue.

14. 42 U.S.C. § 1415(3).

15. 42 U.S.C. § 1413(a).

ruled that the notice provisions of the APA did not apply because of the exception in Section 553(a). See also Hahn v. Gottlieb, 430 F.2d 1243, 1247 n. 4 (1 Cir. 1970) (FHA mortgage regulation exempted); Stroud v. Bensen, 155 F. Supp. 482, 490 (E.D.N.C.1957) (regulation to protect agricultural loan exempted).[16]

As earlier observed in *Thorpe*, HUD's circulars in question directly supplement the Annual Contributions Contract by imposing additional obligations on the parties. 393 U.S. at 275, 89 S.Ct. 518. We hold that the district court erred in not holding as a matter of law that the exemption under 5 U.S.C. § 553(a)(2) was applicable. See Chicago Housing Authority v. Harris, 275 N.E.2d 353 (Ill.1971).

▬ This brings us to the final argument raised on appeal—that the coerced implementation of the circulars by withholding funds violates the due process clause of the Fifth Amendment. On May 7, 1971, HUD promulgated Circular HM 7465.1 Supp. 2 which provided in paragraph 4 that HUD could withhold funds *other than guaranteed subsidies* in the Annual Contributions Contract against those local housing authorities which failed to implement HUD's model lease and grievance procedures. In the *Thorpe* case the Supreme Court strongly suggested that such an action might violate the constitutional prohibition of impairment of contracts. U.S.Const. Art.

1, § 10; Lynch v. United States, 292 U. S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434 (1934); see Thorpe v. Housing Authority of the City of Durham, 393 U.S. at 279 n. 33, 89 S.Ct. 518. On the record before us HUD has never approved the withholding of any funding pursuant to HM 7465.1 Supp. 2. In fact, the circular itself specifies that withholding of funds is only one possible means of enforcement, with alternative remedies including judicial relief "or such other action as may be authorized and deemed appropriate." HM 7465.1 Supp. 2, ¶ 4 (May 7, 1971). Since there exists no threatened loss of funds for failure to comply with Circulars 8 and 9, the issue of contract impairment at this time is purely hypothetical. In *Thorpe*, the Court observed, "We do not sit, however, 'to decide abstract, hypothetical or contingent questions . . . or to decide any constitutional question in advance of the necessity for its decision.'" 393 U.S. at 284, 89 S.Ct. at 527. Under the circumstances we determine that HUD was within its authorized power to promulgate Circulars 8 and 9 and that any decision as to the constitutionality of using HM 7465.1 Supp. 2 to assure implementation of the circulars would be premature.[17]

Judgments reversed and remanded with directions to enter summary judgments on behalf of the defendants and intervenor parties upholding the validity of the circulars.

---

16. The exemptions have not been limited to cases where the government has a proprietary interest. Courts have relied on the statutory language which also excludes regulatory matters involving grants and benefits. Thus, in Lazar v. Benson, 156 F.Supp. 259, 270 (E.D.S.C.1957), the court held that as a matter of law agricultural regulations relating to an agricultural price support program were exempt from the notice of proposed rulemaking requirements because the matter related to "loans, grants, benefits, or con-

tracts." Likewise, the court in Rodriquez v. Swank, 318 F.Supp. 289 (N.D.Ill. 1970), held that the requirement of notice was inapplicable because matters relating to welfare grants are exempted.

17. The trial court did not pass on the local authorities' remaining objection that HUD's promulgation of the circulars unlawfully alter the ACC contract. We find little merit to this argument. See Thorpe v. Housing Authority of the City of Durham, 393 U.S. at 280 n. 35, 89 S.Ct. 518.