## THORPE *v.* HOUSING AUTHORITY OF THE CITY OF DURHAM.

No. 20.   Argued October 23, 1968.—Decided January 13, 1969.

*James M. Nabrit III* argued the cause for petitioner. With him on the briefs were *Jack Greenberg, Charles Stephen Ralston, Charles H. Jones, Jr., Anthony G. Amsterdam,* and *William Bennett Turner.*

*Daniel K. Edwards* argued the cause for respondent. With him on the briefs was *William Y. Manson.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

This case raises the question whether a tenant of a federally assisted housing project can be evicted prior to notification of the reasons for the eviction and without an opportunity to reply to those reasons, when such a

procedure is provided for in a Department of Housing and Urban Development (hereinafter HUD) circular issued after eviction proceedings have been initiated.

On November 11, 1964, petitioner and her children commenced a month-to-month tenancy in McDougald Terrace, a federally assisted, low-rent housing project owned and operated by the Housing Authority of the City of Durham, North Carolina. Under the lease, petitioner is entitled to an automatic renewal for successive one-month terms, provided that her family composition and income remain unchanged and that she does not violate the terms of the lease.[1] The lease also provides, however, that either the tenant or the Authority may terminate the tenancy by giving notice at least 15 days before the end of any monthly term.[2]

----

[1] "This lease shall be automatically renewed for successive terms of one month each at the rental last entered and acknowledged below . . . . Provided, there is no change in the income or composition of the family of the tenant and no violation of the terms hereof. In the event of any change in the composition or income of the family of the tenant, rent for the premises shall automatically conform to the rental rates established in the approved current rent schedule which has been adopted by the Management for the operation of this Project . . . ."

[2] "This lease may be terminated by the Tenant by giving to Management notice in writing of such termination 15 days prior to the last day of the term. The Management may terminate this lease by giving to the Tenant notice in writing of such termination fifteen (15) days prior to the last day of the term. Provided, however, that this paragraph shall not be construed to prevent the termination of this lease by Management in any other method or for any other cause set forth in this lease."

The Housing Authority construes this provision to authorize termination upon the giving of the required notice even if the tenant has not violated the terms of the lease and his income and family composition have not changed. Petitioner, however, insists that since the Authority is a government agency, it may not constitutionally evict "for no reason at all, or for an unreasonable, arbitrary and capricious reason . . . ." Brief for Petitioner 27. We do not, however, reach that issue in this case. See n. 49, *infra*.

On August 10, 1965, petitioner was elected president of a McDougald Terrace tenants' organization called the Parents' Club. On the very next day, without any explanation, the executive director of the Housing Authority notified petitioner that her lease would be canceled as of August 31.[3]  After receiving notice, petitioner attempted through her attorneys, by phone and by letter, to find out the reasons for her eviction.[4]  Her inquiries went unanswered, and she refused to vacate.

On September 17, 1965, the Housing Authority brought an action for summary eviction in the Durham Justice of the Peace Court, which, three days later, ordered petitioner removed from her apartment.  On appeal to the Superior Court of Durham County, petitioner alleged that she was being evicted because of her organizational activities in violation of her First Amendment rights. After a trial *de novo*,[5] the Superior Court affirmed the

---

[3] The text of the notice is as follows:

"Your Dwelling Lease provides that the Lease may be cancelled upon fifteen (15) days written notice.  This is to notify you that your Dwelling Lease will be cancelled effective August 31, 1965, at which time you will be required to vacate the premises you now occupy."

[4] One of those attempts was made on September 1.  In an affidavit filed with the Superior Court of Durham County, petitioner alleged that on that day members of the Housing Authority met with a Durham police detective who had been investigating petitioner's conduct.  Although petitioner's attorney met with Housing Authority representatives on this same day to request a hearing, the attorney was not informed what information had been uncovered by the police investigation or whether it had any bearing on petitioner's eviction.

[5] All of the essential facts were stipulated in the Superior Court, including:

"that if Mr. C. S. Oldham, the Executive Director of the Housing Authority of the City of Durham, were present and duly sworn and were testifying, he would testify that whatever reason there may have been, if any, for giving notice to Joyce C. Thorpe of the termination of her lease, it was not for the reason that she was elected

eviction, and the Supreme Court of North Carolina also affirmed.[6] Both appellate courts held that under the lease the Authority's reasons for terminating petitioner's tenancy were immaterial. On December 5, 1966, we granted certiorari[7] to consider whether petitioner was denied due process by the Housing Authority's refusal to state the reasons for her eviction and to afford her a hearing at which she could contest the sufficiency of those reasons.

On February 7, 1967, while petitioner's case was pending in this Court, HUD issued a circular directing that before instituting an eviction proceeding local housing authorities operating all federally assisted projects should inform the tenant "in a private conference or other appropriate manner" of the reasons for the eviction and give him "an opportunity to make such reply or explanation as he may wish."[8] Since the application of

president of any group organized in McDougald Terrace, and specifically it was not for the reason that she was elected president of any group organized in McDougald Terrace on August 10, 1965 . . . ."

[6] 267 N. C. 431, 148 S. E. 2d 290 (1966).

[7] 385 U. S. 967.

[8] The full text of that circular is as follows:

DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT
Washington, D. C.   20410

Circular
2–7–67

Office of the Assistant Secretary
For Renewal and Housing Assistance
TO:          Local Housing Authorities
             Assistant Regional Administrators for
                Housing Assistance
             HAA Division and Branch Heads
FROM:     Don Hummel
SUBJECT:   Terminations of Tenancy in Low-Rent Projects

Within the past year increasing dissatisfaction has been expressed with eviction practices in public low-rent housing projects. During

this directive to petitioner would render a decision on the constitutional issues she raised unnecessary, we vacated the judgment of the Supreme Court of North Carolina and remanded the case "for such further proceedings as may be appropriate in the light of the February 7 circular of the Department of Housing and Urban Development." [9]

On remand, the North Carolina Supreme Court refused to apply the February 7 HUD circular and reaffirmed its prior decision upholding petitioner's eviction. Analo-

that period a number of suits have been filed throughout the United States generally challenging the right of a Local Authority to evict a tenant without advising him of the reasons for such eviction.

Since this is a federally assisted program, we believe it is essential that no tenant be given notice to vacate without being told by the Local Authority, in a private conference or other appropriate manner, the reasons for the eviction, and given an opportunity to make such reply or explanation as he may wish.

In addition to informing the tenant of the reason(s) for any proposed eviction action, from this date each Local Authority shall maintain a written record of every eviction from its federally assisted public housing. Such records are to be available for review from time to time by HUD representatives and shall contain the following information:

1. Name of tenant and identification of unit occupied.
2. Date of notice to vacate.
3. Specific reason(s) for notice to vacate. For example, if a tenant is being evicted because of undesirable actions, the record should detail the actions which resulted in the determination that eviction should be instituted.
4. Date and method of notifying tenant with summary of any conferences with tenant, including names of conference participants.
5. Date and description of final action taken.

The Circular on the above subject from the PHA Commissioner, dated May 31, 1966, is superseded by this Circular.

s/ Don Hummel
Assistant Secretary for Renewal
and Housing Assistance

[9] 386 U. S. 670, 673–674 (1967).

gizing to the North Carolina rule that statutes are presumed to act prospectively only, the court held that since "[a]ll critical events" [10] had occurred prior to the date on which the circular was issued "[t]he rights of the parties had matured and had been determined before . . ." that date.[11] We again granted certiorari.[12] We reverse the judgment of the Supreme Court of North Carolina and hold that housing authorities of federally assisted public housing projects must apply the February 7, 1967, HUD circular before evicting any tenant still residing in such projects on the date of this decision.[13]

In support of the North Carolina judgment, the Housing Authority makes three arguments: (1) the HUD circular was intended to be advisory, not mandatory; (2) if the circular is mandatory, it is an unauthorized and unconstitutional impairment of both the Authority's annual contributions contract with HUD [14] and the lease agreement between the Authority and petitioner; and (3) even if the circular is mandatory, within HUD's power, and constitutional, it does not apply to eviction proceedings commenced prior to the date the circular was issued. We reject each of these contentions.

## I.

Pursuant to its general rule-making power under § 8 of the United States Housing Act of 1937,[15] HUD has

[10] 271 N. C. 468, 471, 157 S. E. 2d 147, 150 (1967).

[11] 271 N. C., at 470, 157 S. E. 2d, at 149.

[12] 390 U. S. 942 (1968).

[13] The Supreme Court of North Carolina stayed the execution of its judgment pending our decision. As a result, petitioner has not yet vacated her apartment.

[14] Under § 10 (a) of the United States Housing Act of 1937, 50 Stat. 891, as amended, 42 U. S. C. § 1410 (a) (1964 ed., Supp. III), HUD is required to enter into an annual contributions contract with the local housing authorities. In that contract, HUD guarantees to provide a certain amount of money over a certain number of years.

[15] 50 Stat. 891, as amended, 42 U. S. C. § 1408 (1964 ed., Supp. III).

issued a Low-Rent Management Manual,[16] which contains requirements that supplement the provisions of the annual contributions contract applicable to project management.[17] According to HUD, these requirements "are the minimum considered consistent with fulfilling Federal responsibilities" under the Act.[18] Changes in the manual are initially promulgated as circulars. These circulars, which have not yet been physically incorporated into the manual, are temporary additions or modifications of the manual's requirements and "have the same effect." [19] In contrast, the various "handbooks" and "booklets" issued by HUD contain mere "instructions," "technical suggestions," and "items for consideration." [20]

Despite the incorporation of the February 7 circular into the Management Manual in October 1967, the Housing Authority contends that on its face the circular purports to be only advisory. The Authority places particular emphasis on the circular's precatory statement that HUD "believes" that its notification procedure should be followed. In addition to overlooking the significance of the subsequent incorporation of the circular into the Management Manual, the Authority's argument is based upon a simple misconstruction of the language actually used. The import of that language, which characterizes the new notification procedure as "essential," becomes apparent when the February 7 circular is contrasted with the one it superseded. The earlier circular, issued on May 31, 1966, stated: "[W]e *strongly urge, as a matter of good social policy,* that Local Authorities in a

---

[16] Housing Assistance Administration, HUD, Low-Rent Management Manual.

[17] *Id.,* § 0 (preface) (April 1962).

[18] *Ibid.*

[19] Housing Assistance Administration, HUD, Low-Rent Housing Manual § 100.2, at 2 (Sept. 1963).

[20] *Ibid.*

private conference inform any tenants who are given . . . [termination] notices of the reasons for this action." [21] (Emphasis added.) This circular was not incorporated into the Management Manual.

That HUD intended the February 7 circular to be mandatory has been confirmed unequivocally in letters written by HUD's Assistant Secretary for Renewal and Housing Assistance [22] and by its Chief Counsel.[23] As we stated in *Bowles* v. *Seminole Rock Co.*, 325 U. S. 410, 414 (1945), when construing an administrative regulation, "a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt. . . . [T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." [24] Thus, when the language and HUD's treatment of the February 7 circular are contrasted with the language and treatment of the superseded circular, there can be no doubt that the more recent circular was intended to be mandatory, not merely advisory as contended by the Authority.

---

[21] Circular from Commissioner Marie C. McGuire to Local Authorities, Regional Directors, and Central Office Division and Branch Heads, May 31, 1966.

[22] "[W]e intended it to be followed. . . . The circular is as binding in its present form as it will be after incorporation in the manual. . . . HUD intends to enforce the circular to the fullest extent of its ability. . . ."

Letter from Assistant Secretary Don Hummel to Mr. Charles S. Ralston of the NAACP Legal Defense and Educational Fund, Inc., July 25, 1967.

[23] HUD's Chief Counsel stated that his "views are the same as those expressed" by Assistant Secretary Hummel. Letter from Mr. Joseph Burstein to Mr. Charles S. Ralston, Aug. 7, 1967.

[24] Accord, *Udall* v. *Tallman*, 380 U. S. 1 (1965). See *Zemel* v. *Rusk*, 381 U. S. 1 (1965).

## II.

Finding that the circular was intended to be mandatory does not, of course, determine the validity of the requirements it imposes.[25] In our opinion remanding this case to the Supreme Court of North Carolina to consider the HUD circular's applicability, we pointed out that the circular was issued pursuant to HUD's rule-making power under § 8 of the United States Housing Act of 1937,[26] which authorizes HUD [27] "from time to time [to] make, amend, and rescind such rules and regulations as may be necessary to carry out the provisions of this Act." [28] The Housing Authority argues that this authorization is limited by the Act's express policy of "vest[ing] in the local public housing agencies the maximum amount of responsibility in the administration of the low-rent housing program, including responsibility for the establishment of rents and eligibility requirements (subject to the approval of . . . [HUD]), with due consideration to accomplishing the objectives of this Act while effecting economies." [29] But the HUD circular is not inconsistent with this policy. Its minimal effect upon

[25] See *Udall* v. *Tallman, supra.*

[26] 386 U. S. 670, 673, n. 4 (1967).

[27] This rule-making power was transferred from the Public Housing Administration to HUD by § 5 (a) of the Department of Housing and Urban Development Act, 79 Stat. 669, 42 U. S. C. § 3534 (a) (1964 ed., Supp. III).

[28] 50 Stat. 891, as amended, 42 U. S. C. § 1408 (1964 ed., Supp. III). Such broad rule-making powers have been granted to numerous other federal administrative bodies in substantially the same language. See, *e. g.,* 72 Stat. 743, 49 U. S. C. § 1324 (a) (Civil Aeronautics Board); 49 Stat. 647, as amended, 42 U. S. C. § 1302 (Department of Health, Education, and Welfare); 52 Stat. 830, 15 U. S. C. § 717*o* (Federal Power Commission).

[29] Section 1 of the United States Housing Act of 1937, 50 Stat. 888, as amended by § 501 of the Housing Act of 1959, 73 Stat. 679, 42 U. S. C. § 1401.

the Authority's "responsibility in the administration" of McDougald Terrace is aptly attested to by the Authority's own description of what the circular does not require:

"It does not . . . purport to change the terms of the lease provisions used by Housing Authorities, nor does it purport to take away from the Housing Authority its legal ability to evict by complying with the terms of the lease and the pertinent provisions of the State law relating to evictions. It does not deal with what reasons are acceptable to HUD . . . . Moreover, the Circular clearly does not say that a Housing Authority cannot terminate at the end of any term without cause as is provided in the lease." [30]

The circular imposes only one requirement: that the Authority comply with a very simple notification procedure before evicting its tenants. Given the admittedly insubstantial effect this requirement has upon the basic lease agreement under which the Authority discharges its management responsibilities, the contention that the circular violates the congressional policy of allowing local authorities to retain maximum control over the administration of federally financed housing projects is untenable.

The Authority also argues that under the Due Process Clause of the Fifth Amendment HUD is powerless to impose any obligations except those mutually agreed upon in the annual contributions contract.[31] If HUD's

---

[30] Brief for Respondent 21, 23.

[31] Although the constitutional prohibition of the impairment of contracts, U. S. Const. Art. I, § 10, applies only to the States, we have held that "[v]alid contracts are property, whether the obligor be a private individual, a municipality, a State or the United States. Rights against the United States arising out of a contract with it are protected by the Fifth Amendment." *Lynch* v. *United States,* 292 U. S. 571, 579 (1934).

power is not so limited, the Authority argues, HUD would be free to impair its contractual obligations to the Authority through unilateral action. Moreover, in this particular case, the Authority contends that HUD has not only impaired its own contract with the Authority, but it has also impaired the contract between petitioner and the Authority. The obligations of each of these contracts, however, can be impaired only "by a law which renders them invalid, or releases or extinguishes them . . . [or by a law] which without destroying [the] contracts derogate[s] from substantial contractual rights." [32]  The HUD circular does neither.

The respective obligations of both HUD and the Authority under the annual contributions contract remain unchanged. Each provision of that contract is as enforceable now as it was prior to the issuance of the circular.[33]  Although the circular supplements the contract in the sense that it imposes upon the Authority an additional obligation not contained in the contract, that obligation is imposed under HUD's wholly independent rule-making power.

Likewise, the lease agreement between the Authority and petitioner remains inviolate. Petitioner must still pay her rent and comply with the other terms of the lease; and, as the Authority itself acknowledges, she is still subject to eviction.[34]  HUD has merely provided for a particular type of notification that must precede

---

[32] *Home Bldg. & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, 431 (1934). The statute challenged in *Lynch* v. *United States, supra,* fell into the first of these two categories. It repealed "all laws granting or pertaining to yearly renewable [War Risk term] insurance . . . ." 292 U. S., at 575.

[33] A far different case would be presented if HUD were a party to this suit arguing that it could repudiate its obligations under the annual contributions contract because the Authority had failed to apply the circular. Cf. *Lynch* v. *United States, supra.*

[34] Cf. *Home Bldg. & Loan Assn.* v. *Blaisdell, supra,* at 425.

eviction; and "[i]n modes of proceeding and forms to enforce the contract the legislature has the control, and may enlarge, limit, or alter them, provided it does not deny a remedy or so embarrass it with conditions or restrictions as seriously to impair the value of the right." [35]

Since the Authority does not argue that the circular is proscribed by any constitutional provision other than the Due Process Clause, the only remaining inquiry is whether it is reasonably related to the purposes of the

[35] *Penniman's Case,* 103 U. S. 714, 720 (1881). See *El Paso* v. *Simmons,* 379 U. S. 497, at 508 (1965); *Home Bldg. & Loan Assn.* v. *Blaisdell, supra.*

We have consistently upheld legislation that affects contract rights far more substantially than does the HUD circular. *E. g., El Paso* v. *Simmons, supra,* upheld a state statute that placed a time limit on the right to reinstate a claim in previously forfeited public lands; *East N. Y. Sav. Bank* v. *Hahn,* 326 U. S. 230 (1945), upheld a New York statute suspending mortgage foreclosures for the 10th year in succession; and *Blaisdell* upheld a statute that extended mortgagors' redemption time.

There is no reason why the principles that control legislation that affects contractual rights should not also control administrative rule making that affects contractual rights. Cf. *Permian Basin Area Rate Cases,* 390 U. S. 747, 779–780 (1968), which upheld a Federal Power Commission order limiting the application of "escalation clauses" in contracts for the sale of natural gas; and 24 CFR §§ 1.1– 1.12 (1968), which proscribe a wide range of racially discriminatory practices by both governmental and private interests that receive any federal financial assistance whether or not pursuant to a pre-existing contract. This regulation was promulgated under § 602 of the Civil Rights Act of 1964, 78 Stat. 252, 42 U. S. C. § 2000d–1, which directs each federal agency that administers federal financial assistance "by way of grant, loan, or contract other than a contract of insurance or guaranty . . . to effectuate the provisions of section 601 [which prohibits racial discrimination in the administration of any program receiving federal financial assistance] . . . by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken."

enabling legislation under which it was promulgated.[36] One of the specific purposes of the federal housing acts is to provide "a decent home and a suitable living environment for every American family"[37] that lacks the financial means of providing such a home without governmental aid. A procedure requiring housing authorities to explain why they are evicting a tenant who is apparently among those people in need of such assistance certainly furthers this goal. We therefore cannot hold that the circular's requirements bear no reasonable relationship to the purposes for which HUD's rulemaking power was authorized.

## III.

The Housing Authority also urges that petitioner's eviction should be upheld on the theory relied upon by the Supreme Court of North Carolina: the circular does not apply to eviction proceedings commenced prior to its issuance. The general rule, however, is that an appellate court must apply the law in effect at the time it renders its decision.[38] Since the law we are concerned with in this case is embodied in a federal administrative regulation, the applicability of this general rule is necessarily

---

[36] See, e. g., FCC v. Schreiber, 381 U. S. 279, 289–294 (1965); American Trucking Assns., Inc. v. United States, 344 U. S. 298 (1953).

[37] Section 2 of the Housing Act of 1949, 63 Stat. 413, 42 U. S. C. § 1441. That section further directs all agencies of the Federal Government "having powers, functions, or duties with respect to housing . . . [to] exercise their powers, functions, and duties under this or any other law, consistently with the national housing policy declared by this Act . . . ." Ibid.

[38] "A change in the law between a nisi prius and an appellate decision requires the appellate court to apply the changed law." Ziffrin, Inc. v. United States, 318 U. S. 73, 78 (1943). Accord, e. g., Vandenbark v. Owens-Illinois Glass Co., 311 U. S. 538 (1941); United States v. Chambers, 291 U. S. 217 (1934).

governed by federal law. Chief Justice Marshall explained the rule over 150 years ago as follows:

> "[I]f subsequent to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied. If the law be constitutional, . . . I know of no court which can contest its obligation. It is true that in mere private cases between individuals, a court will and ought to struggle hard against a construction which will, by a retrospective operation, affect the rights of parties, but in great national concerns . . . the court must decide according to existing laws, and if it be necessary to set aside a judgment, rightful when rendered, but which cannot be affirmed but in violation of law, the judgment must be set aside." [39]

This same reasoning has been applied where the change was constitutional,[40] statutory,[41] or judicial.[42] Surely it applies with equal force where the change is made by an administrative agency acting pursuant to legislative authorization. Exceptions have been made to prevent manifest injustice,[43] but this is not such a case.

To the contrary, the general rule is particularly applicable here. The Housing Authority concedes that its power to evict is limited at least to the extent that it may not evict a tenant for engaging in constitutionally

---

[39] *United States* v. *Schooner Peggy,* 1 Cranch 103, 110 (1801).

[40] See, *e. g., United States* v. *Chambers, supra.*

[41] See, *e. g., Carpenter* v. *Wabash R. Co.,* 309 U. S. 23 (1940).

[42] See, *e. g., Vandenbark* v. *Owens-Illinois Glass Co., supra.*

[43] See *Greene* v. *United States,* 376 U. S. 149 (1964), in which we held that the petitioner's right to recover lost pay for a wrongful discharge was "vested" as a result of our earlier decision in *Greene* v. *McElroy,* 360 U. S. 474 (1959), which we construed to have made a "final" and "favorable" determination, 376 U. S., at 159, that petitioner had been wrongfully deprived of his employment.

protected activity;[44] but a tenant would have considerable difficulty effectively defending against such an admittedly illegal eviction if the Authority were under no obligation to disclose its reasons.[45] On the other hand, requiring the Authority to apply the circular before evicting petitioner not only does not infringe upon any of its rights, but also does not even constitute an imposition. The Authority admitted during oral argument that it has already begun complying with the circular.[46] It refuses to apply it to petitioner simply because it decided to evict her before the circular was issued. Since petitioner has not yet vacated, we fail to see the significance of this distinction. We conclude, therefore, that the circular should be applied to all tenants still residing in McDougald Terrace, including petitioner, not only because it is designed to insure a fairer eviction procedure in general, but also because the prescribed notification is essential to remove a serious impediment to the successful protection of constitutional rights.

## IV.

Petitioner argues that in addition to holding the HUD circular applicable to her case, we must also establish guidelines to insure that she is provided with not only

---

[44] "We do not contend that, in the case of Housing Authority leases if the purpose of the notice of termination of the lease is to proscribe the exercise of a constitutional right by the tenant the notice would be effective; the notice would be invalid, and the term of the lease and its automatic renewal would not thereby be affected." Brief for Respondent 11.

[45] See generally *Thorpe* v. *Housing Authority of the City of Durham,* 386 U. S. 670, 674–681 (1967) (DOUGLAS, J., concurring).

[46] Transcript of Argument 28. Despite this admission, counsel for the Authority insisted throughout his oral argument that HUD has no power to require compliance with the circular. See *id.,* at 26–27, 28, 30–32, 48–49. He even expressly suggested that the Authority could depart from its requirements "without violating any kind of Federal law." *Id.,* at 48.

the reasons for her eviction but also a hearing that comports with the requirements of due process. We do not sit, however, "to decide abstract, hypothetical or contingent questions . . . or to decide any constitutional question in advance of the necessity for its decision . . . ."[47] The Authority may be able to provide petitioner with reasons that justify eviction under the express terms of the lease. In that event, she may decide to vacate voluntarily without contesting the Authority's right to have her removed. And if she challenges the reasons offered, the Authority may well decide to afford her the full hearing she insists is essential.[48] Moreover, even if the Authority does not provide such a hearing, we have no reason to believe that once petitioner is told the reasons for her eviction she cannot effectively challenge their legal sufficiency in whatever eviction proceedings may be brought in the North Carolina courts. Thus, with the case in this posture, a decision on petitioner's constitutional claims would be premature.[49]

*Reversed and remanded.*

MR. JUSTICE BLACK, concurring.

The Court here uses a cannon to dispose of a case that calls for no more than a popgun. The Durham Housing

[47] *Alabama State Federation of Labor* v. *McAdory,* 325 U. S. 450, 461 (1945). Cf. *Zemel* v. *Rusk, supra,* at 18–20; *United States* v. *Fruehauf,* 365 U. S. 146 (1961).

[48] Moreover, if the procedure followed by the Authority proves inadequate, HUD may well decide to provide for an appropriate hearing. Cf. 24 CFR §§ 1.1–1.12 (1968), which establish a detailed procedure to dispose of complaints of racial discrimination in any federally assisted program.

[49] These same considerations lead us to conclude that it would be equally premature for us to reach a decision on petitioner's contention that it would violate due process for the Authority to evict her arbitrarily. That issue can be more appropriately considered if petitioner is in fact evicted arbitrarily. See *Alabama State Federation of Labor* v. *McAdory, supra.*

Authority has clearly stated, both in its brief and at oral argument, that it is fully complying with the directive of the Department of Housing and Urban Development concerning notice to tenants of reasons for their eviction. The only possible issue therefore is whether the directive should apply to Mrs. Thorpe, against whom eviction proceedings were started prior to the effective date of the HUD memorandum but who is still residing in public housing, as a result of judicial stays. I agree, of course, that the directive should apply to her eviction. Nothing else need be decided.