**NORTH RUSH ASSOCIATES,**

v.

**Samuel R. PIERCE, Jr.**

**Civ. No. 82–71581.**

United States District Court, E.D. Michigan, S.D.

April 12, 1985.

**464**

Richard D. Bisio, Southfield, Mich., for plaintiff.

Ellen E. Christensen, Asst. U.S. Atty., Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

GEORGE E. WOODS, District Judge.

### I.

The Croydon Hotel is a 440-room building located at North Rush and Ontario Streets in downtown Chicago, just one block off of Michigan Avenue and Chicago's "Miracle Mile" of upscale stores and office buildings. Built approximately 45 years ago, it served as an apartment building/hotel to accommodate performers on the vaudeville circuit. With demand for lodging for vaudeville performers being what it is, the Croydon could obviously not be expected to return to its former use, but plaintiff North Rush Associates did expect to return the hotel to some of its former glory by redesigning the 440 rooms into 330 full service dwellings. What plaintiff had in mind for this building was to perform a "gut rehab" which would encompass removing all the old components of the building and renovating the interior from scratch. In effect, as one witness testified, this plan would place a new building within the superstructure of the old. From the outside, the Croydon would look much like it did in its halcyon days of greasepaint and seltzer bottles; from the inside, however, the trappings would be more in keeping with this era of hypo-allergenic makeup and mineral water.

Plaintiff filed an application, together with an application fee of $23,163.80, with the Department of Housing and Urban Development (HUD) in the hope of obtaining a conditional commitment for mortgage insurance under HUD's Section 221(d)(4) multifamily rehabilitation program. This program is basically an insurance program to protect a lender from losing money on a project. The application (Exhibit 1), filed on about November 5, 1980, also sought to qualify for a permanent mortgage at an interest rate below the prevailing market rate pursuant to the Government National Mortgage Association (GNMA) Tandem Program.

Under the Tandem Program, the original lender (in this case Percy Wilson Mortgage and Finance Corporation) would hold the mortgage at a market interest rate (13.5%) during the construction on the project and would sell the mortgage to the government agency upon completion of construction. Interest at below market rates would begin with HUD's final endorsement at the completion of construction.

Both the completion of construction and HUD's final endorsement are prerequisites to qualifying for the low interest rate. To receive the final endorsement, a developer has to have paid its bills and must certify that the project is lien-free. At the final closing, a HUD representative physically endorses the mortgage note and the interest rate is then reduced.

Represented by one of its general partners, Stephen Hayman, and its attorney, Sheldon Winkelman, plaintiff attended a pre-application meeting with HUD's Chicago personnel. Also attending this meeting were George Gray, a multifamily housing representative with HUD, and Andrew ·Erkes of the Percy Wilson Mortgage Company. Sheldon Winkelman testified at trial that Gray, who was responsible for the project from beginning to end, was "somewhat skeptical" over plaintiff's ability to complete the project at its projected cost. According to Winkelman, plaintiff considered HUD's negative reaction and re-evaluated its position, but arrived at a renewed conviction that the project could be completed and marketed.

Winkelman also testified that plaintiff submitted a second application (Exhibit 3) after later discussions with Gray and Erkes suggested it would have priority obtaining a low interest rate if a subsidy program were instituted in the building. Plaintiff accordingly filed an application to have approximately 20% of the dwelling units occupied by recipients of HUD subsidies. Winkelman was concerned that having two applications "floating around" HUD might delay processing, but Gray and Erkes assured him that the processing would not be slowed down. No evidence was ·introduced at trial to suggest that this procedure did slow down the processing.

Timing was critical to the project because plaintiff was faced with an eligibility deadline of October 30, 1981 in order to qualify for financing. By that time, HUD would have to have issued a conditional commitment for mortgage insurance.

When an application of this nature is received by HUD, the first step in its processing is a review by a HUD official to ensure that all the appropriate papers have been submitted and the fee paid. Following this review, the application is customarily routed through four branches of the local. HUD office: architectural, cost, valuation and mortgage credit. The first branch, the architectural section, has to be satisfied that the building is sound and that the projected unit sizes are acceptable. Review in this branch might also include a visit to the site of the project. The cost department looks at the proposed cost of the project and determines whether or not it is reasonable. The valuation department, in the words of Winkelman, "goes into the arithmetic of the project" to determine "what's left after renovation." Finally, the mortgage credit department looks at the party's finances to determine whether it has the ability to complete the project.

In addition to the above steps in the process, there are also various levels at which an applicant can enter the process: feasibility, conditional commitment or firm commitment. In an attempt to expedite its application and demonstrate its resolve on this project, plaintiff chose to apply at the conditional commitment stage, thus bypassing the feasibility stage for which no fee is charged.

The parties disagree over just how much trouble this project encountered in the architectural department. Defendant points to the site engineering comments (Exhibit 27) which noted a density of living units far exceeding HUD guidelines and the lack of either on- or off-site parking as indications that the project could not pass muster in the architectural department. Plaintiff argues that these comments were not conclu-

sive as to the department's assessment of the project and points instead to two HUD worksheets (Exhibit 32, p. 5, § J; Exhibit 33, p. 4, § J) on which two different HUD appraisers had approved the adequacy of the site. Because the Court concludes that this department's assessment of the project was not the determinative factor in HUD's eventual rejection of plaintiff's application, it does not view the resolution of this dispute as crucial to the ultimate issues in this case. It should be sufficient to note at this point that the architectural department identified two potential problems with this project which were apparently not insurmountable.

Of greater concern was the valuation department's negative reaction to plaintiff's proposed rental income and expenses. Winkelman testified at trial that HUD lowered plaintiff's income projections and raised its expense estimates, the net effect of which would be to reduce the amount of mortgage money available to plaintiff.

HUD's disagreement with plaintiff's income and expense figures involved five areas of concern:

(1) *Management expense:* HUD estimated this expense to be $87,120.00, based on 5% of effective gross income. Plaintiff argued that a 3% expense ($55,062.00) was more realistic because the proposed management agent, The Hayman Corporation, was owned by two of plaintiff's sponsors, Stephen and Alan Hayman. This "identity/relationship between sponsor and management agent" justified plaintiff's lower estimate of this expense, it argued.

(2) *Elevator maintenance:* HUD estimated this expense to be $32,240.00; plaintiff's estimate budgeted $13,473.00. Plaintiff argued that, among other things, the automation of the freight elevator would reduce this cost.

(3) *Insurance:* HUD estimated $36,300.00 for this expense; plaintiff estimated $14,000.00 on the strength of a quotation from an insurance agent.

(4) *Real estate taxes:* HUD's estimate of $287,708.00 was almost $83,000.00 higher than plaintiff's. Plaintiff challenged this discrepancy chiefly on the ground that HUD had used erroneous "comparables."

(5) *Utilities:* Plaintiff's estimate of $74,655.00 was just under one-half of the HUD estimate for this category. (Exhibit 4).

Upon being informed of HUD's position on these areas of dispute, Winkelman attempted to convince HUD's Chicago office that a mistake had been made. He spoke to George Gray, who offered to do his best to set up a meeting to discuss these issues. A meeting was arranged between Winkelman, Hayman, Erkes, Gray and Leo Singer, the head of the valuation branch. According to Winkelman, it was "a very unsatisfactory meeting," as Gray informed him that Singer was unable to attend. When Singer walked by, Winkelman asked him why he could not attend and Singer replied that he was too busy and that his mind was already made up. At Winkelman's request, the meeting was rescheduled to a time when Singer could attend.

Winkelman came to the rescheduled meeting armed with additional data (Exhibit 4) in support of plaintiff's position. This material was presented to Gray, Singer and Benjamin Tessler, deputy multifamily branch chief, without any apparent change in HUD's position.

Winkelman testified that he continued to press Gray for expeditious treatment of the application and Gray responded that the project was still being reviewed, but it was unlikely HUD's position would change. Andrew Erkes also testified that he then became aware that HUD was prepared to reject the application. He noted that plaintiff sought to delay the issuance of the rejection letter from the Chicago office out of hope that Washington would overrule the Chicago office's decision. George Gray also testified that his office was prepared to reject the application in May of 1981 but held off at plaintiff's request in an attempt to save plaintiff the costs which would result from reopening the application.

The tree having borne no fruit in Chicago, plaintiff decided to take its case to Washington. Winkelman testified that Hal

Barron, a partner in North Rush Associates, arranged a meeting in Washington, D.C., with Stephen Larkin, a deputy assistant secretary for congressional relations at HUD. Larkin testified that he was contacted by his friend, Barron, who told him plaintiff had been having problems with this project and wanted him to speak with Winkelman.

Larkin arranged a meeting in September or early October of 1981 and attempted to line up people with the most technical knowledge about the program. Winkelman presented his case at the meeting, Larkin recalled, and the "technical people" asked questions about the project; but as far as Larkin recollected, there was no substantive decision other than the agreement to review the materials and get back to Winkelman.

Lloyd Wright, a senior appraiser in HUD's central office, conducted the review of plaintiff's material. He issued a four-page memorandum (Exhibit 25) which was used as the basis for another memorandum embodying the final conclusions of HUD's central office. The central office concluded that, with one exception, the Chicago office's estimates were reasonable. Pertinent provisions of this memorandum follow:

1. Management expense

The sponsor and management agent show an identity of interest. The sponsor proposes to manage the property at 3 percent of Effective Gross Income, which is below the typical prevailing rate. Our experience has been that when an agent accepts a fee less than market, there is a cut back in services. An excerpt from Handbook 4480.1, taken out of context, was used by the sponsor as support for this lower fee. The sentence immediately following the excerpt quoted by the sponsor says, 'Such expense should be in reasonable relationship to contract management cost or the type management typically employed.' Should HUD, because of below standard management, foreclosure, or change of ownership during the term of the proposed mortgage find it necessary to hire competent management, the sponsor's proposed amount would be inadequate and there would be insufficient funds generated from the rents to bear the additional expense. This would contribute to an underwriting loss for the Department. Accordingly, we cannot accept the sponsor's proposed fee.

2. Elevator maintenance

The sponsor submitted a letter from a maintenance company that updates an elevator maintenance contract originally executed in 1979 for the Croydon Hotel. The documentation as submitted reflects an amount that would be charged for maintenance to be performed during 'regular working hours of the regular working day of the elevator trade' but does not reflect charges outside of the alluded to regular working hours. In fact, reference to overtime rates was intentionally crossed out.

Accordingly, the sponsor's estimate is not supported. Since elevators may breakdown [sic] at night and on weekends, some provisions must be made in the contract to cover services during non-regular working hours. If it can be conclusively demonstrated that overtime and all other incidental costs are included in the quoted amount, we could accept it for processing purposes.

3. Insurance

A letter from an insurance agent was submitted stating that the sponsor's master contract, which appears to include coverage of other property owned by the sponsor, would be increased $14,000 in order to cover the Croydon property. The possibility exists, that because of other business the sponsor may have with the insurance firm, a discount rate is given. If it can be demonstrated that this is a competitive rate, it would be acceptable for processing.

4. Real estate taxes

A letter from an attorney was submitted that gave a statement of opinion as to what taxes would be. No data was furnished to support this opinion. The spon-

sor also submitted previously processed HUD cases to support, on a square foot basis, his estimate. Neither the letter which is simply an unsupported opinion, nor the previously processed cases, showing processing dates as far as 6–79, are considered adequate documentation.

5. Gas for cooking, hot water and common area heat

The sponsor submitted a utility analysis prepared by his architect. The analysis did not specifically address the commercial area heat. However, the procedure used to arrive at the gas estimate is considered reasonable and indicates, together with the HUD expense data, that the area office's estimate may be high on this item by approximately $50 PUPA. In our opinion, based on both the sponsor's and HUD's data, an estimate of $200 PUPA before trend is considered reasonable.

(Exhibit 26).

Additional considerations raised by this exhibit will be discussed elsewhere in this Opinion.

The central office's analysis was reviewed by Edward Winiarski, chief multifamily appraiser, who made the notation, "NO/UNLESS" on the document following the headings for elevator maintenance, insurance and real estate taxes. According to Winiarski's testimony, this was meant to encourage plaintiff to come back with additional information to support its position.

Plaintiff construes the evidence as having demonstrated that this later analysis was never communicated to the Chicago HUD office or to plaintiff's representatives themselves. This conclusion is not borne out by the testimony of Sheldon Winkelman, who noted that Stephen Larkin called him shortly after the Washington meeting to inform him that some but not all of the adjustments plaintiff sought had been made. Winkelman also testified that Larkin told him the matter would be returned to Chicago for processing in light of the deadline. According to Winkelman, however, he never received a response from George Gray when he called to ask Gray

where the application stood. This testimony is inconsistent with Winkelman's earlier statement that his relationship with Gray was excellent, and the Court is not persuaded that the substance of HUD's rejection was not communicated to plaintiff (through Winkelman) by either Stephen Larkin or George Gray.

The evidence does show, as plaintiff suggests, that Exhibit 26 was not received by HUD's Chicago office. Plaintiff would use this fact to suggest that defendant thus erred because (1) plaintiff could have supplied the information contemplated by Winiarski's "NO/UNLESS" notation had such information been requested, and (2) plaintiff could have provided additional equity in the project if HUD had come forward with a mortgage in an amount less than was originally sought. However, plaintiff introduced nothing at trial to convince the Court that many of its figures were not based on the "sweetheart deals" it had allegedly managed to secure for such expenses as insurance and elevator maintenance. Nor is the Court convinced that the non-receipt of Exhibit 26 by the Chicago HUD office prevented plaintiff from being able to accept a smaller loan by providing additional equity. The testimony is clear that plaintiff's principals were in frequent contact with Chicago HUD officials throughout the negotiations in this matter. Andrew Erkes of Percy Wilson Mortgage Company even testified that, beside his one to two contacts per week on this matter, plaintiff was also in touch with HUD officials frequently, a practice he no longer tolerates on the part of his clients because "third party communications tend to be erroneous." Given this pattern, the Court cannot accept that plaintiff's representatives and George Gray suddenly fell silent as the deadline approached. On the contrary, the Court is persuaded that sufficient lines of communication existed for plaintiff, either with Larkin or Gray, so that the substance of the parties' respective positions was made known to the other in a timely fashion. In short, the allegation that plaintiff heard nothing until it received a rejection letter

after the deadline had passed is not credible.

## II.

■ Defendant suggests as a conclusion of law that this Court lacks subject matter jurisdiction over this case because, under the Tucker Act, 28 U.S.C. § 1346(a)(2), exclusive jurisdiction rests with the Claims Court. This assertion was considered and rejected by this Court and by the judge originally assigned to this case. The Court accordingly relies on its opinion from the bench, rendered on October 11, 1984, in dismissing this argument.

■ The Court does agree with defendant, however, that its power of review in this case is not unfettered and that the standard of review is the "narrow abuse of discretion" standard governed by § 701(a)(2) of the Administrative Procedures Act, 5 U.S.C. § 701(a)(2). See, e.g., *Rank v. Nimmo*, 677 F.2d 692, 699 (9th Cir.1982).

In some respects, this Court's present role can be profitably compared with its function in reviewing the actions of another executive department, the Department of Health and Human Services, in suits brought by claimants who have been denied Social Security disability benefits. While the analogy is not perfect because the standard of review in those cases is governed by another statute, 42 U.S.C. § 405(g), calling for the Court to uphold the department's decision as long as it is supported by substantial evidence, there are some similarities.

In a Social Security case, a claimant might contend that he or she is disabled and thus entitled to benefits on the strength of either exertional or non-exertional impairments. A typical exertional impairment might be a bad back or some other disorder which prevents a person from lifting a given amount of weight; a non-exertional impairment might be a psychological disorder or sensitivity to environmental pollutants which restricts the individual's ability to work. In the case of purely exertional impairments, the Secretary is permitted to rely on a "grid," 20 C.F.R. § 1501 *et seq.*, in order to take administrative notice of the existence of jobs available to a claimant of a certain age, education and prior work experience with a given functional capacity. In the case of a claimant with non-exertional impairments or a claimant whose characteristics do not identically match the description in these medical-vocational guidelines, a non-grid determination must be made, usually by resorting to expert testimony. See, e.g., *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 528 (6th Cir.1981).

■ In effect, plaintiff's complaint is similar to that of a Social Security claimant who challenges the Secretary's reliance on the "grid" when a more particularized review was in order. Plaintiff's challenges to some of defendant's conclusions, for example, take issue with HUD's method of estimating costs and argue that the peculiarities of the Croydon project required the evaluation of those costs on a square footage basis rather than HUD's "per unit" method. The difference between this plaintiff and the hypothetical Social Security claimant, however, is that plaintiff here has failed to provide any authority which would justify this Court's reviewing the wisdom of defendant's methods and conclusions. Put simply, this Court cannot agree that it was an abuse of defendant's discretion to use methods of measurement which differed from those urged by plaintiff.

■ Further, defendant has explained to this Court's satisfaction its reasons for not accepting plaintiff's figures on such expense elements as insurance and management fees. Assuming arguendo that plaintiff was able to secure attractive rates on these elements through "sweetheart deals" or self-management, the Court accepts defendant's position that it must still estimate expenses at market rates to be assured of its ability to "carry" the project in the event of plaintiff's default or removal from the project.

These considerations, taken in conjunction with such other findings as defend-

ant's conclusion that plaintiff was overly optimistic in projecting its occupancy rate, suggest to the Court that defendant did not abuse its discretion in rejecting plaintiff's application.

■ Plaintiff's contention that defendant breached several implied obligations which it assumed is not supported by the law or the facts of this case. As to the law, the Court agrees with defendant that HUD Handbooks "contain mere 'instructions,' 'technical suggestions,' and 'items for consideration,'" *Thorpe v. Housing Authority*, 393 U.S. 268, 275, 89 S.Ct. 518, 522, 21 L.Ed.2d 474 (1969) (footnote omitted), which do not rise to the level of legally enforceable duties. See also *Harrison v. Housing Authority of College Park*, 445 F.Supp. 356, 359 (N.D.Ga.1978), *aff'd*, 592 F.2d 281 (5th Cir.1979). It is also worth noting that, despite the provision in HUD Handbook 4445.1 that an application for a conditional commitment "shall be issued within 30 days of receipt of commitment application," all the witnesses with the exception of Winkelman noted their understanding that this particular application could take from six months to a year to process.

Having been responsible for delaying the issuance of a rejection letter in early 1981, it is somewhat disingenuous for plaintiff to now complain about the timing of such a letter or to contend that the application was not reviewed on the merits. The record demonstrates that defendant gave plaintiff's application considerable attention, both in Chicago and Washington, and made all reasonable efforts to consider the project on the merits from plaintiff's perspective. The Court is persuaded that the absence of Benjamin Tessler's signature on the fee-earned memorandum was, as Tessler testified it may have been, an administrative oversight, and that there was no basis for the return of plaintiff's application fee.

For these reasons, judgment shall be entered for defendant.

So ordered.