[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION 
 I. 
The plaintiff, East Hartford Housing Authority (Authority), filed this summary process action on May 17, 2000, seeking possession of an apartment it leased to the defendant, Michael Colon. The Authority alleges that Colon failed to pay rent for the month of April, 2000. In his answer, Colon raised a number of special defenses to this action. In his first special defense, Colon alleges that the proper amount of rent was tendered prior to service of the notice to quit. In his second special defense, Colon alleges that a dispute exists as to the amount of rent due for the month of April and that no agreement existed. In his third special defense, Colon alleges the equitable defense prohibiting forfeiture of the lease, especially under the circumstance that the tenant offered to pay the full amount allegedly due and owing and in his fourth special defense, Colon alleges that the notice to quit was equivocal.
The court heard the Authority's summary process action on September 7, 2000. The evidence indicates that Colon, a young man who undergoes dialysis every other day as a result of kidney failure, entered into a lease with the Authority effective January 1, 2000, for a dwelling unit on School Street in East Hartford, Connecticut, at a rate of $225 per month. At the time he entered into the lease, Colon was receiving state supplemental assistance in the amount of $189 per month, in addition to CT Page 14985-al federal social security disability assistance in the amount of $599 per month.
When he entered into the lease with the Authority for subsidized public housing, Colon immediately lost the state supplemental assistance. According to the testimony of both Colon and the Authority's leasing and occupancy coordinator, Telmo Zuniga, discussion occurred in February, 2000, concerning a reduction in the rental amount as a result of the reduction in Colon's income. The court also received into evidence a copy of a facsimile from the state department of social services dated February 29, 2000, addressed to Zuniga, reflecting Colon's total income.
Colon testified that he had a discussion with Zuniga subsequent to receiving the facsimile from the department of social services. In that discussion, Zuniga indicated that Colon's rent would be reduced to $170 per month and that Colon was "all set." Zuniga disputes this testimony. Instead, Zuniga testified that Colon failed to attend a meeting with him to finalize the paperwork to reduce the rent and that Zuniga never verbally told a tenant, other than, perhaps, a prospective tenant, a rental amount. Colon further testified that he was in Florida in March and left his rent of $170 with a friend to deliver to the Authority. Colon stated that the friend was told that the rent was $225 and that the friend paid the additional amount for Colon so that Colon would not lose his apartment. The Authority's rental records, received into evidence, reflects that a payment of $225 was received on March 13, 2000.
Colon testified that when he returned from Florida, he went to see Zuniga in April, prior to receiving the notice to quit. Colon offered $182 for April's rent, an amount he believed was the proper amount as a result of a food stamp allotment, but the tender was rejected by the Authority. Colon further testified that Zuniga asked if Colon received the notice to quit. Zuniga testified that Colon signed certain paperwork on April 12, 2000, but failed to mention whether tender was offered. The Authority failed to offer any certification form or affidavit into evidence, but Colon introduced his April 12, 2000, handwritten statement that "I [am] only getting income from SSI which is $599.00 per month." The Authority's leasing and occupancy manager, Linda McComber, testified that, notwithstanding the facsimile received from the department of social services in February, 2000, no action was taken to reduce Colon's rental payment until April 12, 2000, effective May 1, 2000. McComber further testified that, on April 20, 2000, she adjusted, by letter, the effective date of the rental amount decrease to April 1, 2000, and also wrote that Colon needed "to pay $170, plus $20, for a total of $190 before the end of April, in order to avoid going to legal office." CT Page 14985-am
The court heard additional testimony from Courtney Anderson, coordinator of eviction prevention with Community Renewal Team, Inc. (CRT), a state-funded rent bank. Anderson testified that an agreement was worked out with Colon that would enable Colon to receive sufficient funds to pay any arrearage in his account with the Authority. Anderson further testified that the Authority refused to enter into the agreement with CRT.
 II. A. 
The dwelling unit owned by the Authority, a municipal agent, in which Colon resides, is low-income public housing subsidized by the United States Department Housing and Urban Development (HUD). As such, many federal and state requirements apply that are not applicable to private housing. One area regulated by federal and state requirements is the amount of rent that may be charged, and the amount for which Colon is responsible is, of course, the subject of this dispute.
In 1969, Congress amended the United States Housing Act of 1937, codified at 42 U.S.C. § 1402(1) et seq., passing P.L. 91-152 (1969) (the Brooke Amendment), limiting rents to be charged for low-income housing to twenty-five percent of a family's income. This percentage was later revised and today, low-income residents of public housing cannot be charged more than thirty percent of the family's income.42 U.S.C. § 1437a. (2000).[1] The program is administered through regulations promulgated in the code of federal regulations (C.F.R.). The C.F.R. provides a process for annual and periodic audits of a tenant's income. See 24 C.F.R. § 966.4(c) (2000).[2] The C.F.R. also mandates that the tenant execute a release authorizing appropriate agencies to provide financial information to the landlord and further requires the family to provide certain documentation to the landlord. See24 C.F.R. § 5.617(b).[3]
 B. 
The C.F.R. provides no specific road map for how a housing authority should handle interim adjustments. See 24 C.F.R. § 966.4(c). The regulations do, however, require the housing authority to provide for periodic review in the lease. 24 C.F.R. § 966.4(c). The relevant portion of the lease between the Authority and Colon states: "VIII.REDETERMINATION OF RENT; APARTMENT SIZE; ELIGIBILITY: B. (1) If you are in a low rent or a Section 8 project or federal elderly project, your CT Page 14985-an rent may be changed before the next regular rent determination for any of the following reasons: (a) Your circumstances change and have continued for at least one month and seem likely to continue for some time so that a decrease in rent is justified under the schedule of rents or to avoid a hardship. (b)You begin to get public assistance, or your public assistance ends. You must report the change to us in ten days. . . ."
The C.F.R. further provides that "if the [public housing authority] receives information concerning a change in the [f]amily's income or other circumstances between regularly scheduled reexaminations, the [public housing authority] must consult with the family and make any adjustment determined to be appropriate. . . ." (Citation omitted; internal quotation marks omitted.) Housing Auth. of St. Louis Cty. v.Boone, 747 S.W.2d 311, 314 (Mo.Ct.App. 1988). It is clear that the Authority has a duty to make appropriate adjustments to a tenant's rent upon receipt of verified information regarding a change in income or circumstances. While the parties in the present case may dispute when Colon signed a certain form or when Zuniga indicated that he had all the required information, there is no dispute that the Authority received the actual verified financial information from the state department of social services on February 29, 2000.
Thus, this court finds that the Authority failed to comply with its federally mandated duty. First, after proper notification, the Authority may not charge more than the federal law limit. See 42 U.S.C. § 1437a. After receiving Colon's verified information, the Authority continued to pursue this eviction on the ground of nonpayment of rent when the Authority knew that the amount being charged for rent violated the Brooke Amendment. "HUD has broad rule-making authority and rules established by HUD, such as 24 C.F.R. § [966.4(c)] are binding on participating housing authorities." Housing Auth. of St. Louis Cty. v. Boone, supra, 747 S.W.2d 314.
Additionally, the court is concerned by the testimony of the Authority's witness, Zuniga, that he met with Colon in February to discuss both Colon's reduction in income and rent and, despite receiving the department of social services memorandum that states that "Michael [Colon] requested that I send you this new budget,"[4] the Authority professes ignorance to the requested adjustment until April, 2000. Colon, a young man with a life threatening disease, obviously requested the information from the department of social services to comply with the Authority's requirements for making rent adjustments. See24 C.F.R. § 5.617(b). Colon testified that Zuniga stated "Michael, you are all set." The Authority introduced no official verification form that Colon was to sign. Yet, the authority was apparently satisfied with CT Page 14985-ao his handwritten submission on April 12, 2000; a document which included the same information as that submitted in February. Nevertheless, the Authority sought to terminate Colon's lease, alleging that Colon failed to pay his rent. Then, reversing itself, the Authority immediately adjusted his rent downward after refusing a rent tender for a sum in excess of the amount due. Thus, there was simply no basis for issuing the notice to quit for nonpayment of April's rent, because the Authority failed to comply with the federal mandate for rent adjustments.
 C. 1. 
Colon, as noted, raises four special defenses to the Authority's summary process action. Because the Authority failed to reduce Colon's rent or to even determine the actual amount of the rent, the court agrees with Colon that there was a bona fide dispute as to the actual amount of the rent due in April. Similarly, the court finds that the Authority refused to accept Colon's tender of $182, an amount in excess of the lawful rent for Colon for the month of April, which he made prior to service by the Authority of the notice to quit. "A tender of rent by the lessee after a breach of the covenant of payment but before a declaration of forfeiture by some unequivocal act (such as service of Notice to Quit) by the lessor precludes the latter from completing a forfeiture of the lease. Mayron's Bake Shops, Inc. v. Arrow Stores, Inc., 149 Conn. 149,155 (1961). In order to maintain an action for summary process for the nonpayment of rent, the lessor must prove a termination of the lease prior to a tender of rent by the lessee. Simsbury Turnpike Realty v. GreatAP Tea Co., 39 Conn. Sup. 367, 370 (App. Sess. 1983)." Bordiere v.Ramirez, Superior Court, judicial district of New Britain, Housing Session at New Britain, Docket No. 031769 (December 18, 1999, Tanzer,J.); see also Tehrani v. Century Medical Center, 7 Conn. App. 301, 304,508 A.2d 814 (1986). Furthermore, the Authority's refusal to accept Colon's tender of rent in April is more perplexing in light of the Authority's action of April 20, 2000, when it retroactively adjusted Colon's rent (although calling it use and occupancy) to $170 per month, effective April 1, 2000. Thus, it is evident that a dispute existed as to the amount of rent due for the month of April and that no agreement existed as to the amount.
Furthermore, Colon argues that the notice to quit is invalid because of the Authority's letter dated April 20, 2000. in which the Authority contradicts the notice by inviting payment "to avoid going to the legal office." This letter was mailed eight days after the Authority issued the CT Page 14985-ap notice to quit, thereby making the notice equivocal. Subsequent letters from a landlord or his agent have been found to render a notice to quit invalid. See 617 Park Street LTD v. Diakomanolis, Superior Court, judicial district of Hartford-New Britain at Hartford, Housing Session at Hartford, Docket No. 076760 (October 31, 1994, DiPentima, J.) (12 Conn.L.Rptr. 574), citing Danpar Associates v. Falks,37 Conn. Sup. 820, 824, 438 A.2d 1209 (1981).
The Authority's April 20. 2000 letter also indicated that the lease is amended; that "the adjustment is presented in accordance with the terms and conditions of the lease"; that "this notice shall be attached to and made a part of your dwelling lease"; and that "all other terms, and conditions . . . remain the same, except as to the monthly [use and occupancy] which is adjusted as herein stated."[5] The court is not persuaded that the substitution of "use and occupancy" for "rent" in the Authority's April 20, 2000 letter changes the overall tone of the letter, which negates any termination of Colon's tenancy upon Colon paying the much reduced and proper amount of rent. It is also noteworthy that Zuniga testified that he met with Colon on April 12, 2000, the same date the notice to quit was issued by the Authority to be served on Colon, to discuss reduction of Colon's rental payment and the same date Colon signed paperwork reflecting the agreed upon rent adjustment. Accordingly, the notice to quit can hardly be called an unequivocal act terminating Colon's lease. See, e.g., Federal Home Loan Mortgage Corp.,v. Van Sickle, 52 Conn. App. 37, 44-45, 726 A.2d 600 (1999) ("[w]e have held that `[s]ervice of a notice to quit possession is typically a landlord's unequivocal act notifying the tenant of the termination of the lease. The lease is neither voided nor rescinded until the landlord performs this act and, upon service of a notice to quit possession, a tenancy at will is converted to a tenancy at sufferance.'").
 2. 
Finally, Colon argues that this court should not sanction the Authority's rent collection policy barring payment by third parties for low-income public housing. As previously indicated, Anderson, the coordinator of the eviction protection program of CRT, a state-funded rent bank program, testified that the Authority would not cooperate with the rent bank program. Anderson further testified that Colon qualified for the state assistance and that, if Colon made certain payments, CRT would pay the balance. The court received copies of Colon's agreement with CRT and the proposed agreement with the Authority. The Authority's leasing and housing manager, McComber, testified that she had no authority to enter into an agreement with CRT, nor with any other third CT Page 14985-aq party.
Colon's sole financial support is governmental assistance as a result of his very serious medical problems. As previously noted, and bears repeating, this case does not involve private rental housing. The rental of public housing operates by different rules, mainly those enacted to promulgate Congressional enactments and federal regulations.
Congress enacted the United States Housing Act of 1937 to promote the general welfare of the nation by employing federal funds and credit to assist states and their political subdivisions to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe and sanitary dwellings for families of lower income and to vest the maximum amount of responsibility in the administration of housing programs in local public housing agencies. See 42 U.S.C. § 1437.[6] "One of the specific purposes of the federal housing acts is to provide a decent home and a suitable living environment for every American family that lacks the financial means of providing such a home without governmental aid." (Internal quotation marks omitted.) Thorpe v. Housing Authority,393 U.S. 268, 281, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969). Thus, all tenants residing in the Authority's low-income housing will receive financial assistance from some governmental agency.
In Connecticut, as in other states, tenants have the right to assert equitable defenses to summary process actions. The Connecticut Supreme Court affirmed a tenant's right to assert equitable defenses in a summary process action, noting that "[e]quity abhors . . . a forfeiture. . . . It is well settled that equity will relieve against the forfeiture of a lease for non-payment of rent. . . . This ancient principle allows relief because [i]n reason, in conscience, in natural equity, there is no ground to say because a man has stipulated for a penalty in case of his omission to do a particular act (the real object of the parties being the performance of the act), that if he omits to do the act he shall suffer an enormous loss wholly disproportionate to the injury to the other party. . . .The penalty is the forfeiture of the leasehold, imposed for omission to do a particular act, that is, to pay rent; if the payment may be secured without a forfeiture, equity will not permit a forfeiture." (Citations omitted; internal quotation marks omitted). Fellows v.Martin, 217 Conn. 57, 65, 584 A.2d 458 (1991).
"The factors considered by . . . courts in deciding whether to grant equitable relief in nonpayment cases are . . . (1) whether, in the absence of equitable relief, one party will suffer a loss whollydisproportionate to the injury to the other party. . . .and (2) whether CT Page 14985-ar the injury to the other party is reparable." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 66. Under the facts of the present case, Colon meets both factors. Clearly, the loss of Colon's apartment would be totally disproportionate to the alleged injury (loss of rental income) to the Authority. Indeed, it is difficult to find any injury to the Authority. The Authority simply failed to make the required adjustment to Colon's rent and Colon, in fact, tendered more than his true rent.
The second factor, whether the injury is reparable, would seem to require, under the facts of this case, little debate. As framed by the Supreme Court, the test is whether the "landlord's injury can be remedied by money instead of forfeiture of the tenancy." Fellows v. Martin, supra, 217 Conn. 69. The testimony shows that Colon offered money to pay his rent. If accepted, the money offered would have prevented any possible loss to the Authority. At the time of the trial, the balance due had increased, and, even though Colon offered to pay the new balance, with a portion to be paid by CRT, the Authority, again, refused to accept the payment.
The Authority refused to accept the payment offered by Colon because, according to the Authority, it has a policy whereby it refuses to accept funds from third parties, including other governmental agencies. It is difficult for this court to understand the Authority's position of attempting to differentiate between one source of governmental aid and a second source of governmental aid. Indeed, the Connecticut legislature enacted General Statutes § 17b-804 to provide loans and grants to ensure housing for families whose income does not exceed sixty percent of the median income in the state.[7] The legislative history of General Statutes § 17b-804 shows that the legislature passed HB 5703, P.A. 90-257, as part of an overall plan to address homelessness in Connecticut. The bill "was a further step, not a first step and incremental measure toward insuring that the problem of homelessness will be dealt with before it actually occurs." 33 S. Proc., Pt. 2, 1990 Sess., p. 3360, remarks of Senator Richard Blumenthal. Prior to the passage of the bill, later codified as General Statutes § 17-619, transferred to § 17b-804 in 1995, funds were used by local agencies to place homeless persons and families in motels and hotels. The legislative history shows that the Connecticut legislature passed the bill to prevent homelessness in the first place by making state funds available to persons and families having difficulty making rental payments, rather than wait for these same persons to be evicted and then using the funds to place them in hotels or motels. The mechanism established to administer these payments was the rent bank programs CT Page 14985-as established and administered by the commissioner of social services. See General Statutes § 17b-804.
CRT is a rent bank program duly established under § 17b-804. Although the court recognizes that the Authority has the ability to adopt policies necessary to carry out the mandates of state and federal regulations, it is difficult to discern why under the Authority's policy to refuse to accept payments on behalf of tenants from third parties, the federal government is not considered a third party, but CRT, funded by the state, is considered a third party. The Authority's refusal to accept CRT's funds on behalf of Colon directly conflicts with the legislative policy prescribed in § 17b-804 by providing funds to ensure housing for low-income persons who are at risk of becoming homeless and who are, perhaps the most vulnerable. Equity cannot allow this to occur. As did the court, Beach, J., in East Hartford Housing Authority v. Frazer, Superior Court, judicial district of Hartford-New Britain at Hartford, Housing Session at Hartford, Docket No. 009129 (July 1, 1997, Beach, J.), this court also orders that the plaintiff cooperate with CRT to resolve the small financial dispute between the Authority and Colon.[8]
 III. 
As set forth above, the Authority's summary process action for nonpayment of rent must fail because not only has the plaintiff failed to prove its case, but the defendant has proved all of his special defenses. Furthermore, the Authority is ordered to cooperate with CRT to resolve Colon's debt to the Authority.
BY THE COURT
Berger, J.